COMMONWEALTH vs. BOBBY GLENN.

Barnstable. December 16, 1986. — January 27, 1987.

Present: WARNER, CUTTER, & FINE, JJ.

*Practice, Criminal,* Instructions to jury. *Arson. Intent. Error,* Harmless.

At the trial of an arson case in which the sole issue litigated was whether the
    defendant had set the fire wilfully and maliciously, on the one hand, or
    negligently or accidently, on the other, a substantial risk of a miscarriage
    of justice was created in the judge's otherwise correct instructions to
    the jury by his erroneous statement: "A person may be found, however,
    to possess criminal intent for arson if he or she negligently or accidently
    causes a fire and then makes no attempt to report it. The necessary
    criminal state of mind for arson may be in some cases unformed after
    the fire is started." [443-445]

INDICTMENT found and returned in the Superior Court De-
partment on February 28, 1984.

The case was tried before *Augustus F. Wagner, Jr.,* J.

*Thomas C. Federico,* Committee for Public Counsel Serv-
ices, for the defendant.

*Don L. Carpenter,* Assistant District Attorney, for the Com-
monwealth.

FINE, J. The Commonwealth concedes that there was error
in the jury instructions on the intent necessary for the crime
of arson (G. L. c. 266, § 1) of which the defendant, Bobby
Glenn, was convicted. His attorney did not object to the instruc-
tions. We conclude that the error was sufficiently serious in
the context of the whole trial that the instructions created a
substantial risk of a miscarriage of justice. See *Commonwealth
v. Freeman,* 352 Mass. 556, 563-564 (1967); *Commonwealth
v. Miranda,* 22 Mass. App. Ct. 10, 16, 21-22 (1986).

*The Evidence.*

On the morning of October 19, 1983, a fire occurred in
Glenn's apartment, one of four in a two-story house. The pre-

vious night had been a tumultuous one. Glenn had been drinking to the point of intoxication. Sometime after 9 P.M., he fought with his wife, and she left the apartment with the couple's two children. Around 10:30 P.M., he visited Reginald Carter, a neighbor in the building. The defendant spoke to Carter for about a half hour, mentioning, among other things, that he hoped to collect insurance for an injury and that a relative had collected insurance money for a fire in his home. After the defendant left and Carter had gone to sleep, Carter was awakened by the sound of breaking glass and yelling from the defendant's apartment; the noise continued for almost two hours. Around 12:30 A.M., a police officer, responding to a call from the apartment house, spoke to the defendant, and observed him to be drunk, despondent, and belligerent. The officer left without taking any further action.

Beginning around 1:30 A.M., the defendant called an upstairs neighbor several times. According to her testimony, the defendant was "rambling" and repeated a couple of times that he did not want to die after living such a short time. In his third call, around 2:30 A.M., the defendant asked if the neighbor smelled smoke; he thought there might be an electrical fire. When she said she did not, the defendant said: "Do you have any enemies? I have enemies. This place could be torched." When the defendant called again, the neighbor's boyfriend, one David Walinski, responded. Because the defendant insisted that he smelled smoke and was worried about an electrical fire, Walinski went downstairs. There was some smoke, apparently coming from a charred tablecloth in the kitchen. After inspecting the apartment and finding no other smoke or fire, Walinski returned upstairs. He noted that the defendant was drunk and was bumping into things. The defendant called again, insisting there was a fire. At Walinski's suggestion, the defendant roused the landlord at approximately 3:45 A.M. The landlord and Walinski checked the apartment and the basement without finding any sign of fire. The defendant asked Walinski for some cigarettes, which Walinski gave him. Apparently annoyed that he was not taken seriously, the defendant said, "Watch. In four hours this place will be in flames." A short time later, the defendant

spoke to the landlord again about smoke; the landlord inspected the apartment and basement a second time, found nothing, and left. He noted that the apartment was in disarray.

At 4:35 A.M. another upstairs neighbor smelled smoke, alerted her roommates and the downstairs neighbor, and evacuated. The children's bedroom in the defendant's apartment was on fire. The neighbor who had spoken to the defendant approximately six hours before testified that the defendant was even more intoxicated than he had been earlier; when he was told the house was on fire, the defendant responded, "Yes, I hope it burns down." The defendant was arrested at the scene and charged with arson.

At trial, the Commonwealth took the position that the evidence demonstrated that the defendant had intentionally set the fire. The defense, suggesting that the fire started as a result of the defendant's careless disposal of a cigarette, maintained that the fire was set accidentally or negligently. The Commonwealth's expert witness testified that there was no evidence of an accidental fire. Although he could not say how the fire was ignited, by excluding natural or accidental causes he reached the conclusion that the fire had been deliberately set. He specifically excluded the careless disposal of a cigarette as the cause. In his opinion, the type of smoldering fire caused by a cigarette could not have caused such extensive damage in the room in less than an hour. He agreed, however, that if the fire had been properly "insulated" and if there had been a strong enough oxygen source, a cigarette discarded on combustible materials could have resulted in this fire. The defendant's expert witness, on the other hand, concluded that a smoldering cigarette could have started the fire. The evidence concerning the conditions in the children's bedroom was conflicting, with testimony as to varying amounts of clothing, paper, and other debris on the floor and in a crate and evidence both ways as to whether the window in that room was open.

*The Instruction.*

The trial judge correctly instructed the jury that in order to convict the defendant of arson under G. L. c. 266, § 1, the Commonwealth was required to prove beyond a reasonable

doubt that the defendant wilfully and maliciously set fire to, burned, or caused a dwelling house to be burned. Several times the judge stressed that arson required wilfulness and malicious-ness and that a showing of negligence was insufficient. But then, in his final recapitulation, he instructed that: "A person may be found, however, to possess criminal intent for arson if he or she negligently or accidentally causes a fire and then makes no attempt to report it. The necessary criminal state of mind for arson may be in some cases unformed after the fire is started."

*Discussion.*

The Commonwealth concedes that the instruction was er-roneous. See *Commonwealth* v. *Niziolek,* 380 Mass. 513, 526-529 (1980). The second sentence, as it stands, is unintelligible; this may be due to an error in recording it. It is not critical to our analysis. The judge apparently based the instruction on his understanding of *Commonwealth* v. *Cali,* 247 Mass. 20 (1923). In that case a conviction under G. L. c. 266, § 10, for burning a building with the intent to injure an insurer, an offense some-what similar to arson, was based upon a showing that the defendant, who negligently or accidentally started a fire, left the fire without reporting it or attempting to extinguish it with the purpose of allowing the building to burn and with the intent to defraud an insurer. The instruction given to the jury in the *Cali* case was the following:

> "If a man does start an accidental fire what is his conduct in respect to it? A question might arise — as if after the fire has started accidentally, and he then has it within his power and ability to extinguish the fire and he realizes and knows that he can, and then he forms and entertains an intent to injure an insurance company he can be guilty of this offence. It is not necessary that the intent be formed before the fire is started, " *Commonwealth* v. *Cali,* 247 Mass. at 24-25.

In upholding the conviction, the court said: "It is true as the defendant contends, that, if he merely neglected in the emer-

gency of the moment to act, his negligence was not proof of a purpose to commit the crime charged. The intention, however, to injure could be formed after as well as before the fire started." *Commonwealth* v. *Cali,* 247 Mass. at 25. The instruction here did not follow the language in the *Cali* case. It failed to make clear that either the setting of the fire or the failure to extinguish or report it had to be intentional and not merely negligent.

We have given serious thought to the Commonwealth's contention that, considering the charge as a whole with its numerous correct statements of the elements of arson, the jury could not have been misled by the erroneous statement. We view the error, however, as of sufficient significance to outweigh the otherwise accurate instructions, especially since there was no evidence that, once the fire started, the defendant made any attempt to report it. The erroneous formulation, although apparently an afterthought, was the final one left with the jury. It allowed confusion as to the required state of mind, an essential element of the crime of arson. The sole issue litigated at trial was whether the defendant set the fire wilfully and maliciously, on the one hand, or negligently or accidentally, on the other. See *Commonwealth* v. *Gabbidon,* 398 Mass. 1, 5 (1986). Compare *Commonwealth* v. *Harju, post* 963 (1986). Opening and closing statements of both the Commonwealth and the defense focused on that question. The possibility exists that the jury convicted the defendant of arson without finding all the elements required by the statute. Although the evidence was certainly sufficient to support a guilty verdict, it was equivocal in some respects and raised a genuine question of guilt or innocence. On the one hand, there were strong indications that the defendant around the time of the fire was angry and upset, and his statements were suggestive of a guilty mind. On the other hand, he did not own the building, he had no apparent motive to profit in any way from the fire, and he appeared to enjoy a friendly relationship with the other tenants. The expert testimony on the possibility that a careless act started the fire was in direct conflict. Finally, the defendant's intoxication was a factor for the jury to weigh. After instructing

the jury that the defendant's intoxication would not excuse an intentional criminal act, the judge told them that they could consider that evidence to determine "whether [he] did it accidentally or negligently because of intoxication."

For us to conclude in these circumstances that the error[1] did not create a substantial risk of a miscarriage of justice would be to minimize the importance of jury instructions correctly defining what conduct the Legislature has sought to make a criminal offense. Compare *Commonwealth* v. *Miranda,* 22 Mass. App. Ct. at 23. In the circumstances, the defendant is entitled to a new trial.

*Judgment reversed.*

*Verdict set aside.*

---

[1] The failure to object to the instruction cannot reasonably be attributed to tactical considerations. See *Commonwealth* v. *Miranda,* 22 Mass. App. Ct. at 21, 22.