## Commonwealth *vs.* Dung Van Tran.

Suffolk. October 3, 2011. - July 26, 2012.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.

*Armed Assault with Intent to Murder. Assault and Battery by Means of a Dangerous Weapon. Armed Home Invasion. Burning a Dwelling House. Evidence,* Prior misconduct, Privileged communication, Communication between patient and psychotherapist, Intent. *Privileged Communication. Psychotherapist.*

At the trial of indictments charging the defendant with, inter alia, armed assault with intent to murder one of his children and arson of an apartment in which his estranged wife and their children were residing, the judge did not commit an abuse of discretion in admitting evidence of the defendant's prior bad acts (i.e., the wife's testimony that the defendant, on previous occasions, had been abusive toward his wife and son and had threatened the wife), where the challenged evidence was relevant to establish the defendant's motive and intent, and where the judge instructed the jury that the evidence was to be considered only for those purposes. [14-16]

At the trial of indictments charging the defendant with, inter alia, armed assault with intent to murder his daughter and her caretaker, as well as arson of an apartment in which his estranged wife and children were residing, the judge erred in admitting in evidence, over the defendant's objection, incriminating statements that the defendant had made to a psychiatrist about his state of mind at the time of the incident, where those statements were subject to the psychotherapist-patient privilege codified in G. L. c. 233, § 20B, and where the defendant, by claiming that he had not intended to harm anyone but, rather, to commit suicide, did not thereby assert a defense such that he waived that privilege (i.e., a defense that he suffered from a mental or emotional condition that disabled him from forming the intent required for the crimes charged) [16-21]; where the statements at issue bore directly on the defendant's intent in setting the fire, and where the evidence of the defendant's intent otherwise was strong but not overwhelming, this court could not say that the erroneously admitted evidence did not influence the jury and therefore concluded that the error was prejudicial as to those convictions that relied on proof of the defendant's specific intent, that is, armed assault with intent to murder [21-23].

At a criminal trial, the Commonwealth provided sufficient evidence that the defendant assaulted his daughter with gasoline and fire with the intention of killing her, and based on the evidence supporting an inference that the defendant so intended, the jury also could have found the intent elements on the charges of armed assault with intent to murder and assault and battery by means of a dangerous weapon with respect to two other victims on a theory of transferred intent. [23-25]

At the trial of indictments charging armed home invasion and arson of a dwelling, the Commonwealth presented sufficient evidence that the defendant used force against the victims by splashing them with gasoline and subsequently setting them afire and that the defendant intended not only his conduct, i.e., lighting the fire, but also the resulting harm, which in this case was the burning of the apartment. [26-28]

INDICTMENTS found and returned in the Superior Court Department on March 28, 2007, and October 31, 2008.

The cases were tried before *Frank M. Gaziano*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Elizabeth Caddick* for the defendant.

*Macy Lee*, Assistant District Attorney (*David A. Deakin*, Assistant District Attorney, with her) for the Commonwealth.

*Michael T. Porter, Christopher J. Anasoulis, & James T. Hilliard*, for Massachusetts Psychiatric Society, Inc., amicus curiae, submitted a brief.

DUFFLY, J. Late in the afternoon of January 8, 2007, the defendant drove to the apartment of his estranged wife, Lien Lam, and their two children.[1] After entering the apartment and speaking briefly with his six year old son, the defendant retrieved a can of gasoline from his vehicle and carried it into the room where his fourteen month old daughter, Diana, was sleeping. The defendant poured the gasoline in such a manner that it landed on himself, Diana, and Nguyen Trinh, the children's caretaker, as well as on the floor; he then ignited it. The resulting fire engulfed the upper portion of Diana's body, causing permanent disfiguring injuries.[2]

The defendant was indicted for a number of offenses relating to the fire, including armed assault with intent to murder, G. L. c. 265, § 18 (*b*); aggravated assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A (*c*) (i); assault and bat-

---

[1]We acknowledge the amicus brief of the Massachusetts Psychiatric Society, Inc.

[2]Nguyen Trinh and one of her adult sons, Thanh Quach, were both burned during their efforts to rescue the baby. Trinh suffered permanent and disabling burn injuries to her upper body and legs, and Quach suffered burns to his hands. The defendant also suffered serious burn injuries, primarily to his face, arms, hands, and legs.

tery by means of a dangerous weapon, G. L. c. 265, § 15A (*b*); arson of a dwelling, G. L. c. 266, § 1; and armed home invasion, G. L. c. 265, § 18C.[3]

The defendant testified at trial that he had intended only to commit suicide and not to cause injury to anyone else, nor to set fire to the apartment, and that the injuries to others were accidental. He made no claim that he had suffered from a mental or emotional condition that prevented him from forming the requisite intent to commit the offenses, or that he was not criminally responsible for his acts because of mental or emotional impairment. The defendant was convicted by a Superior Court jury of all of the charges before them, and he filed an appeal in the Appeals Court. We transferred the case to this court on our own motion.

The defendant argues that the judge erred in admitting evidence of prior bad acts, and in admitting privileged statements the defendant made to a psychiatrist. He claims also that the Commonwealth's evidence was insufficient to support his convictions and that his motion for a required finding of not guilty on all charges should have been allowed. For the reasons that follow, we set aside the defendant's two convictions of armed assault with intent to murder Diana and Trinh, and we remand those indictments for a new trial. We affirm his remaining convictions.

*Trial.* Based on the Commonwealth's case-in-chief, the jury could have found the following facts. We reserve certain details for later discussion.

The defendant and Lam were married in Vietnam in 1998. For approximately five years, the defendant lived primarily in Boston while Lam remained in Vietnam, during which period

---

[3]The defendant was sentenced to forty to fifty years in State prison on the indictment charging armed home invasion. Concurrent with that sentence, he received prison sentences of eight to ten years for arson of a dwelling, nine to ten years for aggravated assault and battery on Diana Tran by means of a dangerous weapon, and four to ten years for aggravated assault and battery on Nguyen Trinh by means of a dangerous weapon, as well as concurrent sentences of nineteen to twenty years for armed assault with intent to kill Diana and Trinh. He also was sentenced to ten years' probation at the conclusion of his prison sentences for the assault and battery on Quach by means of a dangerous weapon. The Commonwealth entered a nolle prosequi on four additional charges relating to other individuals who had been in the building when the fire started.

the couple's son, Manh, was born. In 2003, Lam and Manh joined the defendant in the United States; Diana was born in November, 2005. From the time the family was united, the defendant verbally and physically abused Lam and Manh. His behavior twice led to police intervention, although criminal charges were not pursued, and in September, 2006, Lam filed for divorce. She moved with Manh and Diana into an apartment that was occupied by Trinh and her two adult sons. Trinh rented a room in her apartment to Lam and provided child care for the children while Lam was at work.

The defendant regularly visited his children at the apartment, under Trinh's supervision when Lam was not present. While there, he would speak primarily to Manh, although, during one visit, the defendant said to Trinh that Lam "shouldn't force me to do things. I will turn violent." He also sometimes made small talk with Trinh's adult son, Thanh Quach, but they had no extended conversation until three weeks before the fire, when the defendant asked Quach to meet him at a restaurant. There, the defendant told Quach that he loved his wife, that she could not leave him, and that if she had a boy friend he would not forgive her.

The defendant sought repeatedly to reconcile with Lam, sometimes by pleading and sometimes by making threats. Shortly before the fire, the defendant threatened to kill Lam and the children if she did not return to live with him, after which Lam notified the police and obtained a temporary protective order. The defendant called Lam and urged her not to appear in court to extend the order, promising to change his behavior. Lam did not seek an extension of the order, which expired after ten days.

Between 4 P.M. and 5 P.M. on January 8, 2007, while Lam was at work and Trinh was watching the children, the defendant telephoned the apartment and spoke briefly with Manh, and almost immediately afterward, the defendant knocked at the back door leading into the kitchen. Manh opened the door while Trinh stood at the sink, and the defendant entered, carrying a bag of food for the children. Diana was sleeping in the living room in a hammock. The defendant took Manh into Lam's bedroom and closed the door. They were in the room only a short time before the defendant emerged and left through the

back door, leaving it open as he departed. Trinh thought he was not returning and told Manh to shut the door. However, as Manh was closing the door, the defendant returned and pushed his way in, hiding something behind his back as he walked through the kitchen and into the living room where Trinh had begun tending to Diana.

Standing in the middle of the room, close to Trinh and Diana, the defendant raised the can to the height of his shoulder, tipped it, and poured gasoline onto the floor, splattering some on himself, Trinh, and Diana.[4] He then ignited the gasoline with a cigarette lighter, setting all three people ablaze.

Trinh picked up Diana and brought her into the hallway, but set her down when she realized she was herself on fire. She cried out to Quach, who had been resting in a bedroom off the hallway when the fire started, and ran outside to the front yard, where she removed her burning clothes. Emerging from his room, Quach saw Diana, who was burning from her stomach to the top of her head, sitting on the floor in the hallway, near a bathroom door. He also noticed the defendant standing in the kitchen doorway, looking down the hall and saying that he was so sad because "[he] burned [his] kid."

Quach immediately picked up Diana, brought her into the bathroom, and put her in the bathtub; he turned on the cold water and attempted to put her under the faucet, but she was too tall, so he filled a container with water from the tap in the sink, which he poured over her, extinguishing the flames. After carrying her out to the front porch, Quach ran back inside to search for others still

---

[4]The testimony of the Commonwealth's eyewitnesses, Manh and Trinh, is not consistent in every detail. Manh testified that Trinh and Diana were in the living room when the defendant entered it carrying the gas canister. This testimony was consistent with forensic evidence presented through expert witnesses that significant gasoline residue was found on the clothing that Diana and Trinh had been wearing at the time of their injuries. It is also consistent with the defendant's own testimony that Trinh and Diana were in the living room when he first went there to set himself on fire.

Trinh testified that she was in the kitchen and Diana was sleeping in the hammock when the defendant reentered the apartment and walked past her, hiding something behind his back. She saw him standing in the living room right next to the hammock where Diana was sleeping as he raised a can up to shoulder level and tipped it; a fire ignited, and she ran into the living room to save the baby.

in the building. The defendant also went out onto the front porch; he took Diana from Quach and was holding her when emergency personnel arrived. While standing on the porch holding Diana, he was heard saying aloud, "This is what you get for cheating on me," and "I know I'll be punished for this for a long time."

Paramedics who placed the defendant and Diana in an ambulance noticed an odor of gasoline coming from Diana's clothes, and subsequent chemical testing by the Boston fire department revealed significant amounts of gasoline residue on both Trinh's and Diana's clothing. En route to the hospital, the defendant snatched a pair of scissors and cut his intravenous tube; he then stated repeatedly, "I did this." Asked by the paramedics what he had done, the defendant said that he had lit himself on fire and burned the baby. While receiving treatment for his injuries at a Boston hospital, the defendant made additional inculpatory statements, discussed in detail below, to a psychiatrist.

*The defendant's case.* The defendant testified on his own behalf. He said that he was not angry at his wife for leaving him, only sad, and that he had decided to kill himself and "wanted [his] wife to remember [him]." The gasoline was in his car when he drove to the apartment, and he brought it into the living room of the apartment intending to commit suicide by using it to set himself on fire. Trinh was in the living room, holding Diana. The defendant told Trinh and the children to leave, and they did so. Trinh and Diana "had already gone into the kitchen" when he poured the gasoline on himself. He did not pour gasoline on them, nor around the house.

Asked on direct examination what he remembered happening immediately after he was burned, the defendant first said, "I felt that I was holding my daughter because I was very upset about the accident, about what had happened outside of my intention."[5] He then said that he picked up his daughter after seeing that Trinh had put her down near the bathroom and after Quach had taken her into the bathroom to put out the fire. According to the defendant, when Quach left the bathroom, he put

---

[5]The defendant testified on cross-examination that Trinh and Diana were five to six feet away from him in the kitchen, both on fire, soon after he lit the gasoline, but he did not know how they came to be on fire.

Diana down in the hallway, and the defendant picked her up and brought her outside to wait for the ambulance.

The defendant denied ever having threatened his wife if she and the children did not return to him. He recalled his restaurant meal with Quach but denied telling Quach that Lam could not leave him and that if she had a boy friend he would not forgive her. He knew that Lam had not gone to court to seek an extension of the protective order, but he denied telling her not to go and that he would change his ways. He testified that he could not recall whether he had said, "That's what you get for cheating on me," while he was on the porch; nor did he know whether he had said, "I've done a terrible thing. I'm going to be punished for this." Finally, the defendant testified that he had no recollection of cutting his intravenous tube in the ambulance.

*Discussion.* a. *Prior bad act evidence.* The Commonwealth moved before trial to admit evidence that the defendant was verbally and physically abusive toward Lam and Manh while the family lived together and that, both before and after they separated, he used threats of violence to coerce Lam into acceding to various demands, including that she borrow money on his behalf to finance his reported use of drugs. Over defense counsel's objection, the judge found that, in light of "the seemingly inexplicable nature of the assault," the probative value of the evidence outweighed its prejudicial effect. See Mass. G. Evid. § 404(b) (2012). The defendant maintains that the prejudicial nature of Lam's testimony substantially outweighed its probative value, and that its admission at trial constituted an abuse of the judge's discretion.

" 'It is well settled that the prosecution may not introduce evidence that a defendant previously has misbehaved . . . for the purposes of showing his bad character or propensity to commit the crime charged . . . .' *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). 'Such evidence may be admissible, however, if relevant for some other probative purpose, including to show intent, motive, state of mind, or some other relevant issue at trial.' *Commonwealth* v. *Robidoux*, 450 Mass. 144, 158 (2007), citing *Commonwealth* v. *DelValle*, 443 Mass. 782, 790 (2005). 'Determinations of the relevance, probative value, and prejudice of such evidence are left to the sound discretion of the

judge, whose decision to admit such evidence will be upheld absent clear error.' *Commonwealth* v. *Robidoux, supra,* and cases cited." *Commonwealth* v. *Morgan,* 460 Mass. 277, 289 (2011). We conclude that it was not error to admit Lam's testimony concerning the defendant's prior bad acts.

After hearing argument from both sides, the judge found that the challenged evidence was relevant to establish the defendant's motive and intent. Lam's testimony about the defendant's abusive behavior while they were living together, in conjunction with her testimony that he threatened to kill her and the children within weeks of the fire, tended to show the defendant's longstanding and persistent anger and hostility toward her. It spoke also to a possible rationale for the defendant's setting fire to himself inside the apartment, namely, to exact revenge on Lam for what he perceived as her betrayal in attempting to leave the marriage. See, e.g., *Commonwealth* v. *Barbosa,* 457 Mass. 773, 794 (2010), cert. denied, 131 S. Ct. 2441 (2011); *Commonwealth* v. *Mendes,* 441 Mass. 459, 464-465 (2004) ("Evidence of the hostile relationship between the defendant and his wife was not offered as improper propensity evidence . . . [but] as evidence of his motive to kill her"); *Commonwealth* v. *Bradshaw,* 385 Mass. 244, 269 (1982) ("Without the challenged evidence the killing could have appeared to the jury as an essentially inexplicable act of violence").[6]

Furthermore, the judge instructed the jury when Lam testified, and again in his charge, that evidence of the defendant's prior bad acts was to be considered only for the purpose of proving the nature of the defendant's relationship with Lam, as it related to his motive and intent in setting the fire. On this record, we cannot say that the judge abused his discretion in admitting Lam's testimony. See *Commonwealth* v. *Holliday,* 450 Mass. 794, 816, cert. denied sub nom. *Mooltrey* v. *Massachusetts,* 555 U.S. 947 (2008) ("Given the probative value of the evidence,

[6]It does not change our analysis that Diana was not the victim of the defendant's earlier abusive acts, where the Commonwealth's theory was that the defendant's hostility and anger toward Lien Lam provided the motive to injure Diana. See, e.g., *Commonwealth* v. *Cruz,* 456 Mass. 741, 748-751 (2010) (evidence of defendant's "volatile relationship" with victim's stepdaughter, who was defendant's former girl friend, was admissible to establish defendant's motive and intent to murder victim).

and the [limiting] instruction, the judge did not abuse her discretion in admitting it").

b. *Psychotherapist-patient privilege.* The Commonwealth introduced, over the defendant's objection, incriminating statements that the defendant made to a psychiatrist a few weeks after the fire. The defendant contends that these statements were subject to the psychotherapist-patient privilege codified at G. L. c. 233, § 20B,[7] and that their erroneous admission was prejudicial and requires the reversal of his convictions. The Commonwealth concedes that the defendant's statements were made during a communication with his psychotherapist that would otherwise render them privileged, but claims that, because the defendant placed his "mental or emotional condition" at issue as an element of his defense of lack of intent, the defendant waived that privilege.

As provided by G. L. c. 233, § 20B (*c*), a patient waives this statutory privilege

> "[i]n any proceeding . . . in which the patient introduces his mental or emotional condition as an element of his claim or defense, and the judge or presiding officer finds that it is more important to the interests of justice that the communication be disclosed than that the relationship between patient and psychotherapist be protected."

Interpretation of the psychotherapist-patient privilege is a question of law that we review de novo. See *Board of Registration in Med.* v. *Doe*, 457 Mass. 738, 742 (2010). Because the defendant objected to the admission of the statements, we review for prejudicial error. See *Commonwealth* v. *Cruz*, 445 Mass. 589, 591 (2005).

During his stay in the burn and trauma unit of a Boston hospital after the fire, the defendant was interviewed by a psychiatrist, Dr. John Findley, who was among the doctors on his treatment

---

[7]General Laws c. 233, § 20B, states in relevant part:

> "Except as hereinafter provided, in any court proceeding . . . a patient shall have the privilege of refusing to disclose, and of preventing a witness from disclosing, any communication, wherever made, between said patient and a psychotherapist relative to the diagnosis or treatment of the patient's mental or emotional condition."

team.[8] The defendant made statements to Findley about his state of mind at the time of the fire, which Findley included in his medical report. The hospital subsequently released the defendant's medical records, including Findley's report, to the Commonwealth pursuant to a subpoena.

The Commonwealth called Findley as a witness. Shortly after direct examination began, the judge, sua sponte, raised the question whether the patient-psychotherapist privilege was applicable. The prosecutor argued that the communication between the defendant and Findley was not subject to the privilege because the defendant had placed his mental state in issue through his defense that he had not intended to harm anyone else but, rather, to commit suicide.[9] The judge did not permit Findley to testify to the defendant's statements, finding that the defendant had not yet placed his mental or emotional condition in issue. The judge did, however, leave open the possibility that Findley might be called as a rebuttal witness in response to the defendant's testimony.

On direct examination, the defendant was asked to explain his intent in lighting the fire. He replied, "I wanted to kill myself." When asked whether he intended "to hurt anyone else in [the] house," he answered, "No." The prosecutor argued at sidebar that this exchange had introduced "a direct conflict about what was in [the defendant's] mind" on the day of the fire, entitling him to call Findley in rebuttal. The judge again rejected the Commonwealth's argument, noting that the defend-

---

[8]Dr. John Findley interviewed the defendant to assess his capacity to undergo an arraignment, and the incriminating statements were made during this assessment. The record does not disclose the circumstances of the in-hospital arraignment.

[9]It was not until Findley had begun to testify that the issue of the privilege was raised, sua sponte, by the judge. The prosecutor stated that he had made defense counsel aware, as early as the defendant's arraignment, that the Commonwealth possessed the defendant's privileged statement to Findley, and he indicated that defense counsel had not disputed that the statements could be admitted pursuant to G. L. c. 233, § 20B (*c*). In addition to notifying defense counsel of his intention to introduce the privileged statements, the prosecutor ought to have moved for their admission prior to Findley's taking the stand. See *id.* (otherwise privileged statements may be admissible only if "the judge or presiding officer finds that it is more important to the interests of justice that the communication be disclosed than that the relationship between patient and psychotherapist be protected").

ant had not mounted a defense of diminished capacity or lack of criminal responsibility and concluding that his answers still had not put his mental or emotional condition at issue.

During cross-examination, the prosecutor pursued a line of questioning that sought to probe the defendant's state of mind in the moments leading up to the fire. The defendant continued to maintain that his sole intent was to die and that he had not intended to hurt anyone else or to set fire to the house.[10] At the conclusion of the defendant's testimony, the Commonwealth renewed its request to call Findley as a rebuttal witness, arguing that the defendant had essentially testified that he was "not thinking rationally at the time" due to a "suicidal ideation." The judge agreed, stating that the defendant "said a number of times that he had no plan, that he wasn't thinking clearly"; the judge held explicitly that it was more important to the interests

---

[10]Some of the pertinent portions of the prosecutor's cross-examination, and the defendant's responses on which the judge appears to have relied, are set forth below:

*Q.*: "It's your testimony you just weren't thinking? Is that your testimony?"

*A.*: "Because I only wanted to die."

*Q.*: "You thought enough to go out and get the gasoline in the first place; is that correct?"

*A.*: "Well, when one wanted to die, there's no thought."

". . .

*Q.*: "[Y]ou could have gone almost anywhere in the world to end your own life, sir; isn't that correct?"

*A.*: "When one thinks about when one wants to die, one doesn't think about where one wants to die."

". . .

*Q.*: "[Y]ou went somewhere very specific, didn't you, sir?"

*A.*: "Because when one wants to die, one doesn't need to think about harming anyone. . . ."

*Q.*: "You went to the room where your baby napped during the day, didn't you, sir?"

*A.*: "Yes. When I went there and when I wanted to kill myself, I did not think about that I was going to hurt my baby, that I was going to hurt the caretaker or that I was going to burn a house."

of justice that the communication be disclosed than that the relationship between psychiatrist and patient be preserved and protected.

The Commonwealth recalled Findley, who testified that the defendant told him that his intention on the day of the fire was "to take [Diana] with him," and that the defendant followed that comment by saying, "I could get in big trouble for that." Findley clarified on redirect that the defendant had answered "yes" when Findley asked him "if he tried to take his daughter with him, did he want her to die, did he want to kill his daughter."[11]

A defendant who raises the defense of lack of criminal responsibility may render admissible otherwise privileged statements made to a psychotherapist. See, e.g., *Commonwealth* v. *Seabrooks*, 433 Mass. 439, 448-450 (2001) (privilege did not apply where defendant elicited testimony from his own expert witnesses regarding his acute stress disorder and dissociative disorder not otherwise specified). We must determine whether the defendant's responses, given during cross-examination, "introduce[d] his mental or emotional condition as an element of his . . . defense," G. L. c. 233, § 20B (c), such that he waived the privilege that otherwise protected his statements to Findley.

The defendant did not state in advance of trial that he would assert a defense based on lack of criminal responsibility. See *Blaisdell* v. *Commonwealth*, 372 Mass. 753, 767 (1977). See also Mass. R. Crim. P. 14 (b) (2) (A), as appearing in 442 Mass. 1518 (2004) (defendant shall notify prosecutor in writing if he "intends to rely upon the defense of lack of criminal responsibility because of mental disease or defect at the time of the alleged crime"). Nor did he give advance notice of,[12] or put before the jury, a defense that relied on a claim of mental or

---

[11]Defense counsel's cross-examination of Findley did not challenge his recall of the defendant's statements but focused on the nature and side effects of medications that were being administered to the defendant at the time of the interview. Counsel did ask Findley what specific question Findley had posed to the defendant that elicited the answer, "I could get in trouble for that." Findley responded that he had asked the defendant, "Did you try and kill your daughter?"

[12]The trial took place prior to our decision in *Commonwealth* v. *Sliech-Brodeur*, 457 Mass. 300 (2010), which mandated that the defendant provide such notice. "[I]n line with the trend of increased discovery in criminal cases,

emotional defect or impairment. See, e.g., *Commonwealth* v. *Diaz*, 431 Mass. 822, 828-830 (2000).[13] The defendant also did not request, and the judge did not give, an instruction that the jury consider the defendant's mental or emotional condition.

The defense theory was one of excuse, namely, that injury to anyone other than the defendant was purely accidental. See *Commonwealth* v. *McLaughlin*, 431 Mass. 506, 514 n.7 (2000). The defendant made no claim during any stage of the proceedings — nor did he suggest, either through argument, conduct of the trial, or request for instructions — that at the time he tried to commit suicide by setting himself on fire, he suffered from a mental or emotional condition that disabled him from forming the intent required for the crimes with which he was charged.[14] The defense was not that the defendant was incapable of forming the intent necessary to support conviction but, rather, that he lacked the requisite intent to harm another. Contrast *Blaisdell* v. *Commonwealth, supra* at 765 (listing examples of ways defendant seeking to assert defense of insanity may do so without testifying, including, e.g., that defendant with prior history of mental disorders and treatment "may offer evidence of the same through medical records with or without expert witnesses" and that lay witnesses may testify to "observations of the defendant prior to, during or subsequent to the time of the alleged crime").

We conclude that the claim of a lack of intent does not, without more, suffice to put in issue a defendant's mental or emotional condition.[15] We reject the Commonwealth's assertion that the

---

. . . the Commonwealth should have advance notice of complex mental health issues that the defendant intends to raise as part of his or her defense." *Id.* at 325.

[13]As we noted in *Commonwealth* v. *Diaz*, 431 Mass. 822, 828 n.4 (2000), "a defendant's inability to form the requisite intent for an element of the crime, commonly although incorrectly referred to as 'diminished capacity,' could reduce the verdict."

[14]During closing argument, counsel made no mention of the defendant's emotional state on the day of the fire; rather, she argued that the defendant had intended only to kill himself, and that the injuries to the victims were the result of "a terrible accident" and a "botched suicide."

[15]The defendant in *Commonwealth* v. *McLaughlin*, 431 Mass. 506 (2000), claimed that he was not criminally responsible for the arson and murders with which he was charged. What we said in that case is instructive:

"It might be argued that mental condition can be an 'excuse' even

defendant's testimony that he did not intend to set fire to the house or to others in it, but intended only to kill himself, was tantamount to the assertion of a defense based on a mental condition described by the Commonwealth as despondency and suicidal ideation. The Commonwealth may not introduce against a defendant statements protected by the psychotherapist-patient privilege on the ground that the defendant himself placed his mental or emotional condition in issue, unless the defendant has at some point in the proceedings asserted a defense based on his mental or emotional condition, defect, or impairment. Because the defendant did not put his mental condition at issue in the manner contemplated by G. L. c. 233, § 20B (*c*), it was error to admit in evidence the statements he made to Findley.

Having concluded that the challenged confession should not have been admitted, we must decide whether the error "did not influence the jury, or had but very slight effect"; we ask whether it can be said "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983). If "the error itself had substantial influence . . . or if one is left in grave doubt, the conviction cannot stand." *Commonwealth* v. *Peruzzi*, *supra* at 446, quoting *Kotteakos* v. *United States*, 328 U.S. 750, 765 (1946).[16]

The evidence of the defendant's statement to Findley bore directly on the defendant's intent in setting the fire, which was

---

when the condition does not rise to the level of insanity. We think such an argument must fail. As the judge told the jury, a defendant's mental disease or defect short of insanity is relevant to whether the defendant was capable of forming the intent needed to commit a particular crime. Once such an intent has been proved, however, mental disease or defect short of insanity is not an 'excuse' for the defendant's conduct."

*Id.* at 514 n.8.

[16]The United States Supreme Court's opinion in *Kotteakos* v. *United States*, 328 U.S. 750 (1946), underscores that the focus of the prejudicial error standard is the impact of the error on the minds of the jury:

"[T]he question is, not were [the jury] right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the

the central issue at trial. See *Commonwealth* v. *Sliech-Brodeur*, 457 Mass. 300, 321-324 (2010) (prejudicial error to compel pretrial production of defense psychiatrist's materials to Commonwealth's expert; material included defendant's statements reflecting her state of mind and supported Commonwealth expert's opinion of criminal responsibility, which was central issue at trial). See also *Miranda* v. *Arizona*, 384 U.S. 436, 466 (1966), quoting *Mapp* v. *Ohio*, 367 U.S. 643, 685 (1961) (Harlan, J., dissenting) (confession by defendant constitutes "the most compelling possible evidence" of defendant's guilt). Without the defendant's unequivocal statement of his intent, the jury might have believed the defendant's testimony that he told Trinh to take the children out of the living room before he poured and ignited the gasoline because he did not want to hurt them. See *Commonwealth* v. *Arana*, 453 Mass. 214, 228 (2009) (judgment reversed where erroneously admitted evidence bolstered alleged victim's credibility, central issue in case). Contrast *Commonwealth* v. *Coleman*, 366 Mass. 705, 711 (1975) (no prejudice where erroneously admitted evidence did not contradict defense theory). The jury might also have drawn inferences more favorable to the defendant from statements he was heard making in the aftermath of the fire, such as, "I know I'll be punished for this for a long time," which could have been viewed as consistent with the claim that he intended only to set fire to himself because he was so upset by Lam's supposed infidelity.[17]

The evidence of the defendant's intent without the statements

---

jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting . . . .

"This must take account of what the error meant to them, not singled out and standing alone, but in relation to all else that happened. And one must judge others' reactions not by his own, but with allowance for how others might react and not be regarded generally as acting without reason. This is the important difference, but one easy to ignore when the sense of guilt comes strongly from the record." (Citations omitted.)

*Id.* at 764.

[17]The prosecutor's closing argument encouraged the jury to consider the defendant's statements at the scene in light of the statements he made to Findley:

"He asked [the defendant], 'Did you want to take your daughter

made to Findley was strong, but it was not so overwhelming as to negate the impact on the jury's judgment of the erroneously admitted confession contained in the medical records. Contrast *Commonwealth* v. *Buckman*, 461 Mass. 24, 38-39 (2011) (although prosecutor's argument regarding faint results in deoxyribonucleic acid [DNA] test not fair and reasonable, no prejudice arose where guilt was "overwhelmingly established" from independent sources of expert forensic evidence, fingerprint, and DNA analysis; erroneous argument "added nothing with comparable heft"). This was the last evidence the jury heard, and the prosecutor relied heavily on evidence of the statements to Findley to argue that the defendant intended to set fire to Diana. Contrast *id.* at 39 (erroneous argument was "afterthought" in structure of closing, and prosecutor acknowledged that evidence was problematic).

The Commonwealth "bears the risk of doubt when any exists as to" whether an error at trial was prejudicial. *Commonwealth* v. *Alphas*, 430 Mass. 8, 23 (1999) (Greaney, J., concurring). We cannot say that Findley's erroneously admitted testimony did not influence the jury. We therefore conclude that the error was prejudicial as to the charges of armed assault with intent to murder Diana and Trinh, as those convictions relied on proof of the defendant's specific intent to commit murder.

c. *Sufficiency of the evidence.* We next address, without taking into consideration Findley's improperly admitted testimony, the defendant's argument that the evidence at trial was insufficient to support his convictions of armed assault with intent to murder Diana and Trinh; assault and battery by means of a dangerous weapon causing serious bodily injury to Diana and

with you?' And what did he answer? 'Yes.' Ladies and gentleman, yes, he was medicated. Yes, he was injured, but it was a month afterwards. You heard Dr. Findley, who I would submit to you wasn't arguing a case. . . .

" 'Did you want to kill your daughter, take her with you?' 'Yes.' 'Why?' Because 'that's what you get for cheating on me.' He was going to make sure not only that his wife remembered him, but that she remembered, in his mind, what he had done to her. He was going to get revenge on her. And that's why he told Dr. Findley, 'Yes,' when Dr. Findley asked, 'Were you trying to kill your daughter?' That's why he said that."

Trinh; assault and battery on Quach by means of a dangerous weapon; armed home invasion; and arson. Reviewing the case under the familiar *Latimore* standard, we conclude that the evidence was sufficient to support each of these convictions. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979) (claim of insufficient evidence reviewed to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" [emphasis in original]).

First, the defendant claims that the Commonwealth did not prove beyond a reasonable doubt the intent element of armed assault with intent to murder and of assault and battery by means of a dangerous weapon.[18] As to his convictions of armed assault with intent to murder Diana and assault and battery by means of a dangerous weapon causing serious bodily injury to Diana, the Commonwealth presented ample evidence that the defendant applied force against Diana by means of gasoline and fire with the intention of killing her.

As previously set forth, there was evidence from which the jury could have found that the defendant was angry that his wife had left him and had threatened to kill her and the children if she did not return; that the defendant arrived at Lam's apartment with a can of gasoline, which he concealed as he entered the living room where Diana was asleep; and that the defendant stood near Diana and Trinh as he poured the gasoline in such a manner as to splash onto Diana's clothing, which was immediately set ablaze when the defendant ignited the gasoline.

Further, there was evidence that, soon after he had ignited the

---

[18]A conviction of armed assault with intent to murder, G. L. c. 265, § 18 (*b*), requires proof of the defendant's specific intent to kill without justification, excuse, or mitigation. See *Commonwealth* v. *Vick*, 454 Mass. 418, 428 (2009), quoting *Commonwealth* v. *Johnston*, 446 Mass. 555, 558 (2006). A conviction of assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A, where the alleged battery involved the intentional use of force rather than the intentional commission of a wanton and reckless act, requires proof that "intentional force was applied against the victim" by means of an object intentionally used in a dangerous fashion. *Salemme* v. *Commonwealth*, 370 Mass. 421, 424 (1976). See *Commonwealth* v. *Appleby*, 380 Mass. 296, 308 (1980).

fire, the defendant made no attempt to aid Diana, nor did he alert other residents that a fire was burning in the house. The defendant's failure to do so undercut his defense that he did not intend to injure Diana and could have been considered by the jury as evidence of consciousness of guilt. Cf. *Commonwealth v. Lowe*, 391 Mass. 97, 108 n.6, cert. denied, 469 U.S. 840 (1984) (murder defendant's failure to call for help after shooting victim was relevant to finding malice).

Finally, evidence of the defendant's intent came from the properly admitted inculpatory statements he made immediately after the fire. In combination, the above provided sufficient evidence that the defendant assaulted Diana with the intention of killing her.

The charges of armed assault with intent to murder Trinh and of assault and battery on Trinh and Quach by means of a dangerous weapon were premised on a theory of transferred intent, as to which the jury were properly instructed.[19] The doctrine of transferred intent is applicable "in situations where the defendant's conduct harms a person other than the intended victim." *Commonwealth v. Melton*, 436 Mass. 291, 296 (2002). "[The] defendant's intent is deemed to extend to" other injured individuals; his intent "encompasses completely unintended victims (including victims of whom the defendant was unaware) who happen to suffer along with the intended victim." *Id.* at 297-298. Based on the evidence supporting an inference that the defendant intended to assault Diana with the gasoline and fire, thereby to kill her, the jury also could have found the intent elements of the alleged crimes against Trinh and Quach, pursuant to the transferred intent doctrine.[20]

---

[19]The judge instructed the jury:

> "If a person picked out an individual and intended to kill that person — call that person Individual A — and had a gun and by mistake missed and hurt Person B, that person could be liable for shooting Person B because the shooter intended to kill the other individual and the act intending to carry out that intent, that specific intent, shot the other person. The law transfers the intent the shooter has against Person A and applies it to the unintended victim, Person B."

Cf. *Commonwealth* v. *Arroyo*, 442 Mass. 135, 149 (2004).

[20]With respect to the charges of armed assault with intent to murder Trinh, and assault and battery by means of a dangerous weapon causing serious

With respect to the charge of armed home invasion, the Commonwealth was required to prove either that the defendant used force or threatened the imminent use of force against a person inside the apartment, or that he intentionally injured someone therein. See G. L. c. 265, § 18C. The defendant contends that the prosecution proceeded solely on a theory of intentional injury; however, this contention is unsupported by the record. As discussed, *supra*, the Commonwealth presented sufficient evidence that the defendant used force against Diana and Trinh by splashing them with gasoline and subsequently setting them afire.

Finally, the defendant argues that the Commonwealth presented insufficient evidence to support his conviction of arson of a dwelling. The Commonwealth was required to prove beyond a reasonable doubt that the defendant "wilfully and maliciously set[] fire to, burn[ed], or cause[d] to be burned . . . a dwelling house." G. L. c. 266, § 1. "[M]alice in arson comprises only three components . . . . 'The wilful doing of an unlawful act without excuse is ordinarily sufficient to support the allegation that it was done maliciously and with criminal intent.' " *Commonwealth* v. *McLaughlin*, 431 Mass. 506, 513 n.6 (2000), quoting *Commonwealth* v. *Goodwin*, 122 Mass. 19, 35 (1877). "[T]he modern definition [of wilfulness] is that 'wilful means intentional' without making reference to any evil intent." *Commonwealth* v. *Luna*, 418 Mass. 749, 753 (1994), quoting *Commonwealth* v. *Welansky*, 316 Mass. 383, 397 (1944). See *Commonwealth* v. *Armand*, 411 Mass. 167, 170 (1991) (wilful conduct is intentional rather than accidental); *Adoption of a Minor*, 343 Mass. 292, 297 (1961) (term "wilfully" only requires actor to intend conduct; no ill will or malevolence required).

The defendant argues that the evidence could support only a finding of intent to burn himself and that the damage to Trinh's apartment was accidental. See J.R. Nolan & L.J. Sartorio, Criminal Law § 424 (3d ed. 2001) ("accidental and negligent

bodily injury to Trinh, a jury reasonably could have inferred that the defendant intended to assault Trinh with the gasoline and fire, and thereby to kill her, from evidence that Trinh was tending to Diana in the living room at the moment the defendant poured out the gasoline and set the fire, as well as the gasoline residue on Trinh's clothing. Thus, the jury need not have relied on the doctrine of transferred intent to convict the defendant of those offenses.

burning" not considered arson). We disagree. The jury could have found, consistent with the judge's supplemental instruction on this point, that the defendant intended not only his conduct, i.e., lighting the fire, but also the "resulting harm, which in this case" was the burning of the apartment.[21]

Viewed in the light most favorable to the Commonwealth, the evidence against the defendant, though circumstantial, supported an inference of his intent to burn the apartment. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979). "An inference drawn from circumstantial evidence 'need only be reasonable and possible; it need not be necessary or inescapable.' " *Commonwealth* v. *Merola*, 405 Mass. 529, 533 (1989), quoting *Commonwealth* v. *Beckett*, 373 Mass. 329, 341 (1977). There was evidence that the defendant carried a can of gasoline into the living room of the apartment, poured gasoline onto the floor, and then used his lighter to ignite it. An investigator for the Boston fire department testified that the deepest burn was in the middle of the living room floor where the defendant was standing when he ignited the fire, and that the burn was consistent with a "pour pattern," that is, a pattern generated "from splash" by a flammable liquid being poured onto the ground and then moving openly. Items in the living room also caught on fire.

A reasonable jury could infer from this evidence that the defendant was aware that by igniting the gasoline he would light not only himself on fire, but other people and things. Further, by his failure to take action to put out the fire, or to sound an alarm, the jury reasonably could have inferred that the

---

[21]The judge instructed in relevant part:

> "Willfulness and malice are required to constitute the state of mind necessary to commit arson. The word 'willfully' means that the act was intentional and by design rather than an act that is thoughtless or accidental. A person acting willfully intends both his or her conduct and the resulting harm. The requirement of willfulness means that accidentally or negligently causing a burning is not arson."

While deliberating, the jury sent a note asking the judge to clarify whether wilfulness "implies intentionally setting the fire to dwelling [*sic*] rather than setting fire in general." The judge then reinstructed as follows: "Willfulness means that the defendant intended [the] resulting harm, which in this case is burning a dwelling house. It means to set a dwelling house on fire, not to light a fire in general."

defendant intended that the fire burn the apartment. See *Commonwealth* v. *Cavedon*, 301 Mass. 307, 314-315 (1938) (no evidence that defendants made any effort to extinguish fire; this and fact that they failed to give any alarm might have been found by jury to be indicative of guilt); *Commonwealth* v. *Vellucci*, 284 Mass. 443, 445 (1933) (defendant, with knowledge that there had been fire in house, left without notifying authorities); *Commonwealth* v. *Cali*, 247 Mass. 20, 24 (1923) (notwithstanding defendant's claim that fire's origin was accidental, jury could find after reviewing all circumstances either that he set it or that after fire was under way he purposely refrained from any attempt to extinguish it). Cf. *Commonwealth* v. *Glenn*, 23 Mass. App. Ct. 440, 444 (1987) (error where instruction failed to make clear that either setting of fire or "failure to extinguish or report it had to be intentional and not merely negligent").

*Conclusion.* For the foregoing reasons, the defendant's two convictions of armed assault with intent to murder are set aside, and the case is remanded for a new trial on those indictments. The remaining convictions are affirmed.

*So ordered.*