NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11836

COMMONWEALTH vs. KRISTEN A. LaBRIE.

Essex.      November 2, 2015. - March 9, 2016.

Present: Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, & Hines, JJ.

Attempt. Homicide. Assault and Battery. Reckless Endangerment of a Child. Intent. Evidence, Intent. Practice, Criminal, Assistance of counsel.

Indictments found and returned in the Superior Court Department on July 3, 2009.

The cases were tried before Richard E. Welch, III, J., and a motion for a new trial, filed on June 6, 2013, was heard by him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

Michelle Menken for the defendant.
Marcia H. Slingerland, Assistant District Attorney (Kate Berrigan MacDougall, Assistant District Attorney, with her) for the Commonwealth.

BOTSFORD, J. The defendant, Kristin LaBrie, was charged with the attempted murder of her young son and related assault

and battery and child endangerment crimes.  The Commonwealth contends that the defendant, with the intent to kill her son, did not give him prescribed chemotherapy and other medications designed to treat the cancer from which he suffered and ultimately died.  At a trial before an Essex County jury, the defendant was convicted on these charges; before us is her appeal from these convictions and also from the denial of her motion for a new trial.  The defendant claims that her conviction of attempted murder must be reversed because the Commonwealth was required, and failed, to prove that the substantive crime of murder was not achieved, and because the judge's instructions to the jury on this crime were erroneous. She further claims that the evidence also was insufficient to permit convictions of the two assault and battery charges, and again that the judge's instructions were legally incorrect. Finally, the defendant argues that the judge erred in denying her motion for a new trial and in particular in rejecting her claims concerning the ineffective assistance provided by trial counsel.  For the reasons discussed below, we affirm the defendant's conviction of reckless endangerment of a child under G. L. c. 265, § 13L; reverse the judgments on both assault and battery charges and order judgment for the defendant on those charges; and reverse the order denying the defendant's motion for a new trial on the charge of attempted murder.

Background.  1.  Factual background.  The jury could have found the following facts.  The defendant had a son, Peter,[1] the victim, who in 2006 was seven years old and presented with significant medical and physical concerns.[2]  In October, 2006, Peter was brought to the Massachusetts General Hospital (hospital) on an emergency basis and diagnosed with lymphoblastic lymphoma, a cancer of the lymph nodes.[3]  At the time of the diagnosis, the defendant was separated from Eric Fraser, her former husband and Peter's father, and the defendant was Peter's primary caretaker.[4]

Dr. Alison Friedmann, a pediatric hematologist-oncologist at the hospital, led the treatment team for the cancer from the point of Peter's first admission and became Peter's primary physician throughout treatment.  When Peter was first diagnosed, Friedmann explained to the defendant the diagnosis, the survival rate, and an overview of the proposed treatment plan for Peter.  The plan consisted of five phases over two years, combining in-hospital and at-home treatment.  It included a complicated

---

[1] A pseudonym.

[2] Peter was severely autistic and did not speak, had severe developmental delay, and also had a history of seizures.

[3] Lymphoblastic lymphoma is a form of non-Hodgkin's lymphoma.

[4] The defendant was the primary caretaker until March, 2008, when Eric Fraser obtained full custody of Peter.

chemotherapy regimen that used many different medications in differing schedules and required heavy parental involvement. With treatment pursuant to that plan, the long-term survival rate for children with lymphoblastic lymphoma is about eighty-five to ninety per cent.[5]

In the first phase of the treatment ("induction" phase), in which the goal was to put the cancer into remission, Peter was hospitalized for two weeks and then treated at home for the next two weeks. During the home treatment portion of this phase, the defendant was responsible for giving Peter an oral medication, dexamethasone, a steroid that is an important part of the treatment. The defendant was to administer dexamethasone beginning in approximately November of 2006. Pharmacy records indicate that this prescription was not filled until April, 2007.[6] It appears that Peter achieved remission of the cancer by the end of this first phase.

In phases two ("consolidation" phase) and three ("inner maintenance" or "delayed intensification" phase) of the treatment, Friedmann prescribed another oral chemotherapy agent,

---

[5] "Long-term survival," according to Dr. Alison Friedmann, means that the child is cured of the disease and it never recurs.

[6] According to Friedmann, the defendant filled the prescriptions at a certain pharmacy in Peabody only; however, the defendant testified that she picked up the prescriptions related to the first phase from the hospital.

6-mercaptopurine (6-MP). The defendant was responsible for giving Peter 6-MP every night beginning in or about early December, 2006, and was to continue for three or four months. Pharmacy records indicate that this prescription was not filled until June 28, 2007. Nonetheless, in the winter or early spring of 2007, the defendant told Friedmann she was having a hard time giving Peter the 6-MP, and the doctor changed the prescription to a liquid form. The third phase required planned hospital stays to receive chemotherapy as an inpatient, along with continued at-home administration of 6-MP.

Throughout the first three phases of Peter's treatment, a home care nurse from the hospital visited the defendant and Peter on a regular basis. During the first month of treatment the nurse traveled to the defendant's home once or twice per week and thereafter visited when blood tests were needed. During these visits, the home care nurse reviewed the plan of care and answered any questions the defendant had about administering the medications. During the fall of 2006 into the winter of 2007, the home care nurse asked the defendant if she had given Peter the medications and the defendant reported that Peter was taking his medications. The defendant also reported to Friedmann that generally "things seemed to be going okay," and aside from letting Friedmann know she was having trouble

giving Peter the 6-MP, she never indicated there were any difficulties giving Peter the medications.

The fourth phase ("reinduction" phase), which started in the spring of 2007, involved intravenous medications in the clinic and oral steroids. Peter had weekly visits with Friedmann during which the doctor checked his blood, reviewed the medications with the defendant, and discussed how Peter was doing. During this phase, the entirety of the chemotherapy was administered at the hospital and, according to the pharmacy records, the oral medication prescription was filled.

The final phase of treatment ("maintenance" phase) began at the end of June, 2007, and was intended to continue for sixteen months. This phase involved three medications, including 6-MP, that were to be given to Peter by the defendant at home and one medication that was to be administered intravenously during a monthly visit to the hospital. Although the 6-MP prescription was supposed to be refilled every month and administered nightly during this final phase, the monthly prescription was only filled on June 28, 2007; September 5, 2007; and January 30, 2008. In August, 2007, the defendant told the home care nurse that "the medications were going good," Peter was tolerating them, and she had no concerns. Although she never filled the prescription for the liquid form of 6-MP, the defendant further

reported to the home care nurse that Peter was taking the liquid form of 6-MP, and "it was going better."[7]

During a clinic visit in February, 2008, Peter had a bad cough and fever and his platelet count was lower; he was diagnosed with influenza and the respiratory syncytial virus. Friedmann was worried about a relapse, instructed the defendant to stop his chemotherapy medicine, and prescribed an antiviral medication to treat influenza. The defendant told the home care nurse that she was not giving Peter the antiviral medication because she did not want to make him sick. The nurse attempted to schedule an appointment for the end of that week to draw Peter's blood, but the defendant was unavailable. Because it struck Friedmann as "odd" that the hospital was unable to obtain the blood test, she telephoned the pharmacy to determine whether Peter's prescriptions had been filled as prescribed. The records revealed that the defendant had not filled multiple medications prescribed to Peter throughout the treatment period.[8] The doctor telephoned the defendant and told her they "really needed to get some lab tests done." When the defendant brought

---

[7] Throughout the treatment, the defendant brought Peter in for all of his doctor's appointments and for all of his outpatient and inpatient hospital treatments; on a few occasions, Peter missed an appointment, but the defendant brought him in within a few days of the scheduled appointment.

[8] Friedmann testified at trial that multiple breaks in chemotherapy treatment are "very significant."

Peter to the hospital the next day, the doctor discovered that Peter had suffered a relapse, meaning that the cancer had returned.[9]  Friedmann asked the defendant about the missed prescriptions, but the defendant insisted that the pharmacy must have made a mistake.  After the pharmacy confirmed that no mistake had been made, Friedmann and a social worker at the hospital filed a report of child abuse or neglect with the Department of Children and Families (DCF) pursuant to G. L. c. 119, § 51A.

During a meeting with a DCF social worker after that report had been filed, the defendant claimed that she had administered all of the medications prescribed, and at some point stated to the social worker that she knew withholding Peter's medicine would be "like pushing him in front of a car."  At the end of March, 2008, Fraser obtained custody of Peter, and in April the defendant signed a stipulation rescinding her visitation rights with Peter and agreeing to give Fraser full custody of him. After it was confirmed that Peter had relapsed, Friedmann explained to the defendant and Fraser that the cancer could not be treated with the original treatment because the cancer was now resistant to that treatment; the only viable treatment was a bone marrow transplant, a complicated procedure with a low

---

[9] Peter's cancer at this time was leukemia (cancer of the blood and bone marrow), as compared to the earlier diagnosis of lymphoma (cancer of the lymph nodes).

chance of survival. Peter's parents decided against the bone marrow transplant, and it became clear that continued treatment would only control the cancer but could not cure it; thereafter, chemotherapy was suspended. Peter died on March 30, 2009, of respiratory failure secondary to acute lymphoblastic leukemia.

The Commonwealth's theory was that the defendant understood that not giving Peter the prescribed medications would create a substantial risk of death, that she made an intentional decision to withhold the medications from Peter because she wanted to kill him, and that she repeatedly lied in order to conceal her ongoing efforts to kill her son. It was not possible to determine -- according to Friedmann -- whether the defendant's noncompliance with the medication protocol caused Peter's cancer to return (and therefore his death), but the defendant's noncompliance created a significant risk that the cancer would do so.

The theory of the defense was that the defendant's failure to administer Peter's medications[10] was done without any intent to kill her son. Rather, the short-term effect of the chemotherapy treatment was simply too burdensome for a single caretaker such as the defendant, and she was so fatigued by the end of the treatment that her judgment waned. The defendant

---

[10] At trial, the defendant admitted that she failed to give Peter various medications during treatment.

testified to this effect, as did Dr. Frederick Krell, a forensic psychologist who testified as an expert witness for the defense. Krell opined that the defendant was overwhelmed with having to cope with an impaired child who had a life-threatening illness, and she was unable to keep in mind the long-range goal of the treatment. In response, the Commonwealth called Dr. Martin Kelly, a psychiatrist, who testified that the defendant did "not have any mental disorder or psychological condition that would affect her capacity to premeditate, to weigh the pros and cons, to intend to do the acts that she did."

2. Procedural background. In July, 2009, the defendant was indicted on charges of attempted murder, G. L. c. 265, § 16; wantonly or recklessly permitting substantial bodily injury to a child under the age of fourteen, G. L. c. 265, § 13J (b); wantonly or recklessly permitting serious bodily injury to a disabled person, G. L. c. 265, § 13K (e); and wantonly or recklessly endangering a child, G. L. c. 265, § 13L. In April, 2011, at the end of trial, a jury found the defendant guilty of all four charges.[11] The defendant filed a timely notice of appeal and, represented by her present appellate counsel, subsequently filed a motion for a new trial that included claims

---

[11] The defendant was sentenced to a term of from eight to ten years on the conviction of attempted murder, and concurrent five-year terms of probation on the remaining convictions, to be served from and after the prison sentence.

of ineffective assistance of trial counsel.  The trial judge held an evidentiary hearing on the ineffective assistance claims at which three witnesses testified.  Following the hearing, the judge denied the defendant's motion for a new trial.  On November 27, 2013, the defendant filed a notice of appeal from this denial, and the appeals were consolidated.  We transferred the case to this court on our own motion.

Discussion.  1.  Attempted murder:  nonachievement.  The defendant challenges the sufficiency of the evidence for her conviction of attempted murder.  She argues that the crime of attempted murder, like the crime of general attempt, has three elements:  (1) a specific intent to kill, (2) an overt act, and (3) nonaccomplishment or nonachievement of the completed crime.  In her view, the Commonwealth was required to prove all three of these elements beyond a reasonable doubt and argues that because the Commonwealth, by its own admission, was unable to prove nonachievement, her motion for a required finding of not guilty should have been allowed.[12]  Alternatively, she contends that even if the trial evidence were sufficient to preclude a required finding on the element of nonachievement, the judge's failure to include any instruction on this element meant that the jury did not consider whether the Commonwealth presented

_____

[12] For the purposes of this argument, the defendant does not challenge the sufficiency of the evidence of intent to kill and of an overt act.

sufficient evidence, creating a substantial risk of a miscarriage of justice. We disagree. For the reasons next discussed, we conclude that specific intent and commission of an overt act are the required elements of the crime of attempt or, here, attempted murder, but that nonachievement of the murder, while clearly relevant, is not itself an element that the Commonwealth must prove beyond a reasonable doubt.

The crime of attempted murder is defined in G. L. c. 265, § 16,[13] and is distinct from the crime of general attempt, G. L. c. 274, § 6.[14] Notwithstanding the differences in the language, our cases have tended to treat the elements of attempt as the same under both statutes. See Commonwealth v. Peaslee, 177 Mass. 267 (1901) (attempt to burn building); Commonwealth v. Kennedy, 170 Mass. 18 (1897) (attempted murder). It is also the case that attempted murder may be prosecuted as an attempt under c. 274, § 6, rather than c. 265, § 16. See, e.g., Commonwealth v. Dixon, 34 Mass. App. Ct. 653, 655 (1993).

---

[13] General Laws c. 265, § 16, provides in relevant part:

"Whoever attempts to commit murder by poisoning, drowning or strangling another person, or by any means not constituting an assault with intent to commit murder, shall be punished . . . ."

[14] General Laws c. 274, § 6, provides in relevant part:

"Whoever attempts to commit a crime by doing any act toward its commission, but fails in its perpetration, or is intercepted or prevented in its perpetration, shall, except as otherwise provided, be punished . . . ."

This case appears to be the first in which this court has considered directly whether nonachievement is an element of attempted murder, or more generally, attempt. Unquestionably, the defendant's argument that nonachievement is an element of attempt crimes is not without support: a number of cases arising under the general attempt statute have included nonachievement as an element of attempt. See, e.g., Commonwealth v. Marzilli, 457 Mass. 64, 66 (2010) (attempted indecent assault and battery); Commonwealth v. Bell, 455 Mass. 408, 412 (2009) (attempted rape). And the Appeals Court has recognized a form of nonachievement -- "failure or interruption" -- as an element of attempted murder under G. L. c. 265, § 16. See, e.g., Commonwealth v. Murray, 51 Mass. App. Ct. 57, 61 (2001); Dixon, 34 Mass. App. Ct. at 655. In contrast to this case, however, in all of the cited cases the question whether the substantive crime was completed was not at issue -- there was no disagreement that it had not been achieved -- and the element of nonachievement was not substantively discussed. Moreover, a number of other cases decided by this court and the Appeals Court suggest that the elements of attempt are limited to the requisite intent and an overt act. See, e.g., Commonwealth v. Rivera, 460 Mass. 139, 142 (2011); Commonwealth v. Ortiz, 408 Mass. 463, 470 (1990); Commonwealth v. Gosselin, 365 Mass. 116, 120-121 (1974); Commonwealth v. Cline, 213 Mass.

225, 225 (1913); Commonwealth v. Sullivan, 84 Mass. App. Ct. 26, 28-30 (2013), S.C., 469 Mass. 621 (2014).

This court's jurisprudence on attempt dates back to Kennedy, 170 Mass. 18, a decision authored by then Justice Holmes, that considered a case of attempted murder brought under an earlier version of G. L. c. 265, § 16; and Peaslee, 177 Mass. 267, authored by then Chief Justice Holmes, concerning an attempt to burn a building under an earlier version of G. L. c. 274, § 6. In Kennedy, supra, the defendant was charged with attempted murder by placing deadly poison on the victim's cup with the intent that the victim drink from the cup, ingest the poison, and die. Id. at 20. Although it is clear from the opinion that the victim did not die as a result of the defendant's acts, see id. at 23, the fact is of little significance in the court's discussion of the nature of the crime. Rather, the court focused principally on the nature of the overt act or acts taken by the defendant toward accomplishment of the intended murder.[15] With respect to the overt acts, Justice Holmes emphasized that not all acts leading toward the substantive crime are subject to punishment as a criminal attempt, but only those that come "near enough to the result," i.e., accomplishment of the substantive crime:

---

[15] The court made clear that the evidence of the defendant's intent to kill the victim was sufficient. Commonwealth v. Kennedy, 170 Mass. 18, 25 (1897).

> "[W]e assume that an act may be done which is expected and intended to accomplish a crime, which is not near enough to the result to constitute an attempt to commit it, as in the classic instance of shooting at a post supposed to be a man. As the aim of the law is not to punish sins, but is to prevent certain external results, the act done must come pretty near to accomplishing that result before the law will notice it."

Id. at 20. See id. at 22 ("Every question of proximity must be determined by its own circumstances . . ."). See also Peaslee, 177 Mass. at 271 ("The question on the evidence, . . . precisely stated, is whether the defendant's acts come near enough to the accomplishment of the substantive offence to be punishable").[16]

Kennedy and Peaslee explain and illustrate that the essence of the crime of attempt is to punish the defendant's substantial acts toward the accomplishment of an intended substantive offense. See Commonwealth v. Burns, 8 Mass. App. Ct. 194, 196

---

[16] The court in Commonwealth v. Peaslee, 177 Mass. 267, 272 (1901), continued in further explanation:

> "That an overt act although coupled with an intent to commit the crime commonly is not punishable if further acts are contemplated as needful, is expressed in the familiar rule that preparation is not an attempt. But some preparations may amount to an attempt. It is a question of degree. If the preparation comes very near to the accomplishment of the act, the intent to complete it renders the crime so probable that the act will be a misdemeanor although there is still [an opportunity to change one's mind] in the need of a further exertion of the will to complete the crime."

The court concluded that at least the acts alleged in the indictment, collection and preparation of combustible materials in a room, by themselves did not come near enough to the accomplishment of the substantive offense of burning (arson) to be punishable. See id. at 273-274.

(1979). See also R.M. Perkins, Criminal Law, at 552 (2d ed. 1969). The substantive crime is clearly both relevant and important, because what the crime of attempt aims to punish are acts that bear a proximate relation to that crime; put another way, the substantive crime helps to define and delimit what acts may have the requisite proximity. But the acts stand on their own, and whether a particular act qualifies as an overt act that, combined with proof of the requisite intent, constitutes a criminal attempt does not depend on whether the substantive crime has or has not been accomplished.[17]

In contending that nonaccomplishment is an element of attempt that the Commonwealth must prove, the defendant relies principally on cases such as Marzilli, 457 Mass. at 66, and Bell, 455 Mass. at 412.[18] In these decisions, as previously

---

[17] By way of example, in Kennedy, 170 Mass. at 21-22, the Commonwealth's failure to prove that the amount of poison placed on the cup was "large enough to kill" was of no import to the defendant's liability under the law of attempted murder:

"Any unlawful application of poison is an evil which threatens death, according to common apprehension, and the gravity of the crime, the uncertainty of the result, and the seriousness of the apprehension, coupled with the great harm likely to result from poison even if not enough to kill, would warrant holding the liability for an attempt to begin at a point more remote from the possibility of accomplishing what is expected than might be the case with lighter crimes."

Id. at 22.

[18] The defendant also relies on Beale, Criminal Attempts, 16 Harv. L. Rev. 491 (1903).

mentioned, the court listed nonachievement as an element of attempt, but did not otherwise discuss it.  Both these cases involved the general attempt statute, G. L. c. 274, § 6, which contains language that focuses specifically on failing to accomplish, or being prevented from accomplishing, the substantive crime.[19]  On reflection, we consider this language to represent not a separate element of the crime of attempt but "a further refinement of the definition of the overt act." Commonwealth v. Aldrich (No. 1), 88 Mass. App. Ct. 113, 118 (2015).  That is, the language helps to clarify and reinforce the point that attempt is a crime separate and distinct from the substantive offense to which it is connected, one that focuses on, and punishes, acts that threaten the accomplishment of the substantive offense, not the substantive offense itself. Accordingly, to the extent that our decisions such as Marzilli and Bell indicate that proof of nonachievement of the substantive crime is an element of attempt, we no longer follow

---

[19] "Whoever attempts to commit a crime by doing any act toward its commission, but fails in its perpetration, or is intercepted or prevented in its perpetration, shall . . . be punished . . ." (emphasis added).  G. L. c. 274, § 6.  The statute defining attempted murder, G. L. c. 265, § 16, does not contain this language, but as discussed previously, we take the view that the essential elements of "attempt" are the same in both statutes.

them.[20]  The elements of attempt, whether general attempt or attempted murder, are (1) the specific intent to commit the substantive crime at issue, and (2) an overt act toward completion of the substantive crime.[21]

Here, the Commonwealth is not able to prove beyond a reasonable doubt either that the defendant murdered Peter or that the defendant failed to murder him.  We agree, as does the Commonwealth, that in these circumstances, the defendant cannot be convicted of murder.  But "requiring the government to prove failure as an element of attempt would lead to the anomalous result that, if there were a reasonable doubt concerning whether or not a crime had been completed, a jury could find the defendant guilty neither of a completed offense nor of an attempt."  United States v. York, 578 F.2d 1036, 1039 (5th Cir.), 439 U.S. 1005 (1978).  See Gosselin, 365 Mass. at 120

---

[20] The Appeals Court recently has concluded that under the general attempt statute, "the completed substantive offense nullifies the existence of an attempt."  Commonwealth v. Coutu, 88 Mass. App. Ct. 686, 701 (2015).  See Beale, Criminal Attempts, 16 Harv. L. Rev. at 506-507.  There is no need for us to consider this issue in the present case, because, quite apart from the fact that the general attempt statute does not apply, the Commonwealth admittedly did not and could not prove completion of the substantive offense.

[21] Commonwealth v. Dykens, 473 Mass. 635 (2015), is not to the contrary.  In that case, we considered whether three successive failures to break into a dwelling could be prosecuted as three separate attempts.  With respect to each of these attempts, the failure served to delimit the attempt's overt act, but the failure was not itself an element of the offense.

(stating, in dictum, that requiring proof beyond reasonable doubt that attempt failed would mean that "if there were a reasonable doubt whether the attempt succeeded, the defendant could not be convicted either of the completed crime or of the attempt.  We have rejected such requirements").  See also United States v. Rivera-Relle, 333 F.3d 914, 919-921 (9th Cir.), cert. denied, 540 U.S. 977 (2003) (failure to complete entry into United States was not element of offense of attempting to reenter United States without consent of Attorney General; discussing Federal and State decisions on whether nonachievement must be proved as element of attempt); Lightfoot v. State, 278 Md. 231, 238 (1976) (where no joint venture theory existed, robbery was complete, but uncertainty existed about whether defendant himself had completed robbery, defendant charged with attempted robbery because "failure to consummate the crime is not an indispensable element of criminal attempt").

Our conclusion that nonachievement of murder is not an element of attempted murder essentially disposes of the defendant's challenge to the judge's instructions on this crime. The judge instructed the jury that the Commonwealth "[does not] have to prove that the defendant caused the death of [Peter]. It's instead attempted murder, that is she had the intent with malice and then she makes some overt act toward the murder . . . .  Attempted murder only exists if there's not an actual

murder, of course."  The judge further instructed the jury on the element of an overt act, stating that they must find "some actual outward physical action as opposed to mere talk or plans. . . .  [A]n act . . . that is reasonably expected to bring about the crime [of murder]."  We conclude that the judge's instructions correctly explained the elements of attempted murder.

2.  Assault and battery charges.  The defendant challenges her convictions of assault and battery upon a child, in violation of G. L. c. 265, § 13J (b), fourth par. (§ 13J [b], fourth par.); and of assault and battery upon a person with a disability, in violation of G. L. c. 265, § 13K (e) (§ 13K [e]).  Section 13J (b), fourth par., punishes a caretaker of a child who "wantonly or recklessly permits substantial bodily injury" to the child,[22] and § 13K (e) punishes a caretaker of a person with a disability who "wantonly or recklessly permits serious bodily injury" to the person with a disability.[23,24]  The

---

[22] General Laws c. 265, § 13J (b), fourth par. (§ 13J [b], fourth par.), provides in relevant part:

"Whoever, having care and custody of a child, wantonly or recklessly permits substantial bodily injury to such child or wantonly or recklessly permits another to commit an assault and battery upon such child, which assault and battery causes substantial bodily injury, shall be punished . . . ."

[23] General Laws c. 265, § 13K (e) (§ 13K [e]), provides in pertinent part:

defendant contends that although the Commonwealth may have presented sufficient evidence to prove that the defendant caused a substantial risk of death to Peter by not giving him the prescribed chemotherapy and related medications, it did not present evidence sufficient to prove "substantial bodily injury." She further argues that the judge's instructions to the jury incorrectly defined the meaning of substantial bodily injury.[25] We agree with the defendant on both points.

---

"Whoever, being a caretaker of [a] . . . person with a disability, wantonly or recklessly permits serious bodily injury to such . . . person with a disability . . . shall be punished . . . ."

[24] Section § 13J (b), fourth par., concerns "substantial bodily injury" to a "child," and § 13K (e) concerns "serious bodily injury" to a "person with a disability." In this case, the Commonwealth's position is that Peter fit the definition of "child" in the first of these statutes, and of "person with a disability" in the second. The defendant does not argue otherwise, and we agree. We have previously concluded that the definitions of "substantial bodily injury" in § 13K (b) and "serious bodily injury" in § 13K (e) are substantively the same. See Commonwealth v. Roderiques, 462 Mass. 415, 423 n.2 (2012). Because of this, and because the remaining provisions in the two statutes are also substantively identical, for ease of reference, the discussion in the text that follows considers only the charge under § 13J (b), fourth par., but the discussion applies equally to the charge under § 13K (e).

[25] At trial, the defendant moved for a required finding of not guilty on both these charges, arguing that the Commonwealth failed to prove the defendant had caused actual bodily injury to Peter. The trial judge denied the defendant's motion for a required finding of not guilty, explaining that under the common law the defendant's argument might be sound, but under the statutory causes of action at issue proof of a substantial risk

The term "[b]odily injury" is defined in G. L. c. 265, § 13J (a), as a

> "substantial impairment of the physical condition including any burn, fracture of any bone, subdural hematoma, injury to any internal organ, any injury which occurs as the result of repeated harm to any bodily function or organ including human skin or any physical condition which substantially imperils a child's health or welfare."

The term "[s]ubstantial bodily injury" is defined in the same section to mean "bodily injury which creates a permanent disfigurement, protracted loss or impairment of a function of a body member, limb or organ, or substantial risk of death."  We previously have stated, in discussing § 13J (b), fourth par., that

> "[the term 'bodily injury'] defines the bodily injuries the Legislature intended to be punishable under the statute, i.e., burns, fractures, injuries to internal organs, and perilous physical conditions, while ['substantial bodily injury'] lays the foundation for greater sanctions based on the gravity and consequences of the bodily injury sustained.  Read together, . . . a substantial bodily injury includes any substantial impairment of the physical condition that causes a protracted impairment of the function of an internal organ or a substantial risk of death.  As it appears in the context of the statute, death is not an injury, but one risk of injury."

Commonwealth v. Chapman, 433 Mass. 481, 484 (2001).  See

Commonwealth v. Roderiques, 462 Mass. 415, 423 (2012)

("substantial bodily injury" under § 13J [b], fourth par.,

---

of death was sufficient.  The jury instructions reflected the judge's stated understanding of the law.

requires risk of injury to "come to fruition in the form of an actual injury").

The evidence at trial permitted the jury to find, based on Friedmann's testimony, that the defendant's failure or refusal to give Peter the medications that were part of his treatment plan caused an increased risk of death for Peter.  However, if death itself does not qualify as a "bodily injury" or "serious bodily injury" under the statute, see Chapman, 433 Mass. at 484, neither does an increased risk of death.  The Commonwealth asserts, however, that the defendant's withholding of medications led to Peter's cancer returning in a more virulent and treatment-resistant form, and that this more potent illness was itself a "bodily injury" that, in the words of § 13J (b), fourth par., the defendant wantonly or recklessly permitted to occur.[26]

The Commonwealth's argument fails.  Although the presence of a stronger, more treatment-resistant form of cancer may qualify as a "bodily injury" under the statutory definition, see G. L. c. 265, § 13J (a) ("bodily injury" defined to include "any physical condition which substantially imperils a child's health

---

[26] The evidence that the Commonwealth appears to rely on was the following.  In responding to a question by the prosecutor as to whether Peter's receipt of some but not all his medications affected her ability to treat him once he relapsed, Friedmann responded, "Yes.  I believe that likely made the chemotherapy less effective the second time around and the leukemia more resistant."

or welfare"), an opinion that a particular result is "likely" does not appear to be sufficient to permit a finding that the defendant's actions actually caused the more treatment-resistant form of cancer to occur.[27]  Given that, according to the evidence, even with full treatment ten to fifteen per cent of children still succumb to the cancer, just as the Commonwealth admittedly could not prove beyond a reasonable doubt that the defendant's actions caused Peter's death from cancer, so it appears that the Commonwealth would not be able to prove that the defendant's actions caused him to relapse and become ill with a more treatment-resistant form of cancer.

We thus conclude that the trial evidence was insufficient to support the defendant's assault and battery convictions under §§ 13J (b), fourth par., and 13K (e), and those convictions must be vacated.[28]  The defendant also was convicted of reckless

---

[27] Section 13J (b), fourth par., punishes a caretaker who "wantonly or recklessly permits substantial bodily injury to" the child.  The word "permits" signifies that the Commonwealth is not required to prove the caretaker actually inflicted the bodily injury -- failure to act when there is a duty to do so may suffice -- but the word "permits" does not remove the Commonwealth's burden to prove beyond a reasonable doubt the causal connection between the caretaker's actions or nonactions and the claimed substantial bodily injury.

[28] In light of our conclusion, it is not necessary to resolve the defendant's challenge to the jury instructions on the two assault and battery charges.  We agree with the defendant, however, that these instructions appear to be based on an incorrect reading of the (identical) definitions of "substantial bodily injury" and "serious bodily injury" in G. L.

endangerment of a child in violation of G. L. c. 265, § 13L.[29] She challenged that conviction as duplicative in light of her conviction under § 13J (b), fourth par., see Roderiques, 462 Mass. at 424, but agrees that if the conviction under § 13J (b), fourth par., is vacated or reversed, the conviction under § 13L may stand.

3. *Motion for new trial:  ineffective assistance of counsel*.  Finally, the defendant claims that the judge abused his discretion by denying the defendant's motion for a new trial on the ground of ineffective assistance of counsel.  She argues that counsel was ineffective in three ways:  (1) failing to consult an independent oncologist;  (2) agreeing to order his expert witness, Krell, to turn over his records to the

_____

c. 265, §§ 13J (a) and 13K (a), respectively.  The judge's instructions appear to define the terms to mean "[either] bodily injury which results in a permanent disfigurement, protracted loss or impairment of bodily function, limb or organ, or a substantial risk of death" (emphases added).  However, we read the statute to define "substantial bodily injury" as a "bodily injury" that results in (1) a permanent disfigurement, or (2) protracted loss or impairment of a bodily function, limb, or organ, or (3) substantial risk of death.  See Instruction 6.160 of the Criminal Model Jury Instructions for Use in the District Court (2009) (reckless assault and battery causing serious injury).

[29] General Laws c. 265, § 13L, provides in relevant part:

"Whoever wantonly or recklessly engages in conduct that creates a substantial risk of serious bodily injury or sexual abuse to a child or wantonly or recklessly fails to take reasonable steps to alleviate such risk where there is a duty to act shall be punished . . . ."

Commonwealth's expert, Kelly;[30] and (3) failing to present evidence concerning the defendant's history with DCF.[31] We conclude that counsel's failure to consult an independent oncologist fell measurably below the standard of "an ordinary fallible lawyer." Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). In the circumstances of this case, this failure deprived the defendant of "an otherwise available, substantial ground of defense" to the charge of attempted murder. Id.

a. Background. Represented by new counsel on appeal -- her present counsel -- the defendant filed a motion for a new trial on June 6, 2013. The trial judge held an evidentiary hearing on the motion, at which three witnesses testified on behalf of the defendant: Kevin James, the defendant's trial counsel; Dr. Paul Pitel, a board-certified pediatric hematologist-oncologist; and Krell. In addition, the affidavits

---

[30] With the assent of defense counsel, a Superior Court judge ordered information and records relating to the defendant to be sent to the Commonwealth's expert, Dr. Martin Kelly. The defendant's counsel directed the defendant's expert, Dr. Frederick Krell, to comply with the order. Krell produced over 200 pages of materials, including the results and raw data from psychological tests he had performed.

[31] The defendant's trial counsel agreed to represent her pro bono in the District Court at a point in time when she had been charged only with reckless endangerment of a child under G. L. c. 265, § 13L. Trial counsel continued to represent the defendant in the Superior Court when she was later indicted for attempted murder and two charges of assault and battery. This was trial counsel's first criminal case in the Superior Court and first criminal case in which a mental health defense was asserted.

of trial counsel and Pitel that had been filed in support of the motion for a new trial were introduced in evidence as motion exhibits.

At the motion hearing, James testified that he sought funds to retain an independent oncologist in order to rebut the testimony of Friedmann, a key witness for the Commonwealth's case, but later decided not to consult an oncologist on the grounds that (1) an effort to establish that the failure to medicate was harmless would be unsuccessful, especially with the Commonwealth's opportunity to cross-examine the expert; and (2) seeking to belittle Friedmann's testimony would reflect poorly on the defendant. At the motion hearing, Pitel, chair of the department of pediatrics at Nemours Children's Clinic in Jacksonville, Florida, testified that he has treated children with lymphoblastic lymphoma since 1978.

Consistent with his affidavit,[32] Pitel testified at the motion hearing that the professional literature makes clear that

---

[32] Pitel stated in his affidavit:

"[I]t is unfortunately not rare to care for children whose parents do not fully comply with the demands of extended chemotherapy protocols. Many of these parents find the regimen too difficult and burdensome to follow, and some cannot understand the risks associated with a failure to do so. This occurs despite all efforts by hospital and clinic staff to educate, urge compliance, and warn of the risks of noncompliance. . . . Over the years, I have helped care for a significant number of patients whose parents were less than compliant. More than a few of

the adherence rates[33] for many long-term drug therapies are no more than forty or fifty per cent. Noncompliance with cancer treatment protocols is lowest when the patient is an adolescent, but a major concern with pediatric populations generally; adherence is a considerable issue with drugs that are used to treat an asymptomatic illness or to prevent illness. Based on his experience, Pitel offered several reasons parents do not adhere to the treatment protocol: the immediate side effects of the medications are much more obvious than any benefits; noncompliance often has no visible detrimental effect, and thus parents do not fully appreciate the consequences; when the child appears healthy parents often stop complying, especially when the child resists the medications; and parents may not believe the treatment will work and do what they think will work. Pitel opined that, in this case, the defendant's personal circumstances signaled a higher risk of noncompliance, and the defendant likely did not understand that her lapses in compliance could be lethal, especially given that, according to his medical records, Peter achieved remission early on and his doctor ordered repeated holds on chemotherapy and told the defendant that Peter was doing well throughout the treatment.

---

these parents were personally limited and/or had children with complex disabilities and/or emotional disorders."

[33] The degree of adherence varies and may include partial adherence or erratic adherence.

In denying the defendant's motion for a new trial, the judge concluded that defense counsel "chose the best possible defense and presented it well at trial."  The judge dismissed the importance of Pitel's testimony, reasoning that Pitel agreed with Friedmann's treatment plan and Friedman's stated opinion that compliance is critically important.  The judge noted that Pitel would be unable to opine about the defendant's own intent or state of mind.  Although recognizing that the literature exploring reasons for noncompliance with similar chemotherapy protocols could have been instructive to trial counsel, the judge concluded that such "general education would not have accomplished 'something material to the defense.'"

b.  Standard of review.  When evaluating an ineffective assistance of counsel claim, we consider "whether there has been serious incompetency, inefficiency, or inattention of counsel -- behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer -- and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence."  Saferian, 366 Mass. at 96.  "In cases where tactical or strategic decisions of the defendant's counsel are at issue, we conduct our review with some deference to avoid characterizing as unreasonable a defense that was merely unsuccessful" and ask whether the decision was manifestly unreasonable when made (citation omitted).  Commonwealth v.

Kolenovic, 471 Mass. 664, 673-674 (2015). Strategic choices made before a complete investigation are reasonable "[only] to the extent that reasonable professional judgments support the limitation on investigation" (citation omitted). Commonwealth v. Lang, 473 Mass. 1, 14 (2015). With respect to our review of the denial of a motion for a new trial, we recognize that the decision to allow or deny such a motion rests within the sound discretion of the motion judge, and we give deference to the factual findings of that judge, particularly when he or she was also the trial judge. See Commonwealth v. Pillai, 445 Mass. 175, 185 (2005).

c. Discussion. Trial counsel's decision not to consult with an independent oncologist appears to have been a strategic decision. However, given the salient and essentially undisputed facts about Peter's life-threatening cancer, his excellent prognosis with continued treatment, and the defendant's failure to give the prescribed medications over a long period of time, it was clear that the defendant's intent would be the key issue at trial. The Commonwealth's theory was that, unlike other parents, the defendant failed to administer life-saving medications to her son, and she lied about her noncompliance; the only explanation for this behavior was that she intended to kill her son. In the circumstances, it was patently unreasonable for the defendant's counsel not to consult with a qualified pediatric oncologist to explore the disease, its

treatment, and in particular whether experience dealing with other caretaking parents might help to identify explanations other than an intent to kill the child for a parent's decision not to give medications.  See Commonwealth v. Haggerty, 400 Mass. 437, 442-443 (1987).

The information provided by Pitel in his affidavit and his testimony at the motion hearing concerning the noncompliant behavior of parents with children suffering from cancer show that parental noncompliance is not uncommon.  Many parents do not adhere to the treatment protocol for a number of reasons other than an intent to kill the patient, including a patient's healthy appearance during remission, a parent not wanting to make the child sicker, and the absence of apparent adverse effects resulting from noncompliance.  Such evidence would have been significant in the defendant's case, offering an explanation for the defendant's conduct that placed her squarely within a group of parents of children similarly situated with Peter, and thereby offering an explanation for her conduct that was understandable and within some available norm of parental behavior -- and not, as the Commonwealth argued, the actions of a woman who "seethed" with anger at her former husband and intending to kill her son as an act of retaliation against the father.  As such, this evidence had the potential of raising a reasonable doubt about the existence of the defendant's criminal

intent.[34,35]  See Commonwealth v. Martin, 427 Mass. 816, 822

(1998) (affirming allowance of motion for new trial on grounds

of ineffective assistance where defendant's trial counsel failed

to call expert to challenge Commonwealth's vulnerable cause-of-

death theory; new evidence on cause of death "could have raised

a reasonable doubt in the minds of the jury").  See also

Commonwealth v. Roberio, 428 Mass. 278, 281-282 (1998), S.C.,

440 Mass. 245 (2003) (defendant's trial counsel's failure to

investigate defendant's lack of criminal responsibility and call

expert witness constituted ineffective assistance of counsel;

defendant's motion for new trial should have been allowed).  And

quite apart from testifying at trial, an expert such as Pitel

could have educated and informed the defendant's counsel about

---

[34] Although a pediatric oncologist could not have testified
on direct examination about the substance of the literature
supporting the opinions he or she had derived from personal
experience with children and their parents, see Department of
Youth Servs. v. A Juvenile, 398 Mass. 516, 532 (1986), the issue
of literature might well have been raised on cross-examination,
and then available for defense counsel to explore further on
redirect examination; the issue might have been raised as well
if the prosecutor challenged the credibility of the witness's
opinion.

[35] There was no "inhibiting conflict" between Pitel's
testimony and the theory of the defendant's defense.  See
Commonwealth v. Martin, 427 Mass. 816, 822 (1998).  The defense
sought to portray the defendant as an overwhelmed single mother,
overburdened by the circumstances, who did not want to make her
son even sicker.  Peter went into remission early on in
treatment, and the lapses in medications appeared to make no
difference in his health.  Pitel's testimony at the motion
hearing supported the defendant's proffered explanation at trial
of her motivation and conduct.

the disease, the treatments, and what the medical literature teaches concerning treatment compliance by parents -- information that would have greatly aided defense counsel in his cross-examination of Friedmann and other medical personnel from the hospital.

In rejecting the potential value and significance of Pitel's testimony, the judge focused particularly on the fact that Pitel agreed with Friedmann's treatment protocol,[36] that Pitel could not testify to the defendant's own state of mind, and that the defendant repeatedly had lied. These reasons are not persuasive. With respect to the lying, Pitel's motion testimony suggests he would have been able to offer noncriminal reasons why a person in the defendant's circumstances might lie about withholding medications. And although Pitel certainly could not testify about the defendant's own state of mind, he could explain, based on his own professional knowledge and experience, the common patterns of behavior of parents who fail to comply in cancer treatment and whether the defendant's reported behavior was consistent with those patterns. See, e.g., Commonwealth v. Dockham, 405 Mass. 618, 628 (1989) (expert testimony concerning general patterns of behavior of sexually abused children). See also Commonwealth v. Pike, 431 Mass. 212, 221-222 (2000) (expert testimony on battered woman syndrome).

---

[36] The fact that Pitel agreed with Friedmann's treatment protocol is irrelevant to the introduction of evidence regarding the treatment compliance of parents.

In sum, we conclude that trial counsel's decision to forgo any consultation with an oncologist was manifestly unreasonable, and likely deprived the defendant of a substantial ground of defense on the central disputed issue in the case, namely, the defendant's intent. To deny her motion for a new trial would be unjust. The defendant is entitled to a new trial on the charge of attempted murder.[37]

Conclusion. The judgment of conviction on the indictment charging a violation of G. L. c. 265, § 13L, is affirmed. The judgments of conviction on the indictments charging violations of G. L. c. 265, § 13J (b), and G. L. c. 265, § 13K (e), are vacated, and judgment is to enter for the defendant on each indictment. The order denying the defendant's motion for a new trial on the indictment charging a violation of G. L. c. 265, § 16, is vacated. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

So ordered.

---

[37] In light of our conclusion, we comment briefly on the defendant's remaining two claims of ineffective assistance. With respect to the ineffectiveness claim concerning Krell's records, in light of Commonwealth v. Hanright, 465 Mass. 639, 644 (2013), the disclosure of Krell's records to the Commonwealth's expert does not appear to have been inappropriate. As for the ineffectiveness claim relating to the defendant's history with the Department of Children and Families, trial counsel's strategic decision to forgo evidence of that history was not manifestly unreasonable.