NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-13317

COMMONWEALTH  vs.  QASIM Q., a juvenile.

Barnstable.      January 4, 2023. - April 6, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt, & Georges, JJ.

Burning of Property.  Attempt.  Delinquent Child.  Intent. Evidence, Intent.  Statute, Construction.

Complaint received and sworn to in the Barnstable County/Town of Plymouth Division of the Juvenile Court Department on January 31, 2020.

The case was heard by Mary O'Sullivan Smith, J.

The Supreme Judicial Court granted an application for direct appellate review.

Michelle Menken for the juvenile.
Johanna Black, Assistant District Attorney, for the Commonwealth.
Cristina F. Freitas & Debbie F. Freitas for youth advocacy division of the Committee for Public Counsel Services & others, amici curiae, submitted a brief.

CYPHER, J.  On August 27, 2020, the juvenile was arraigned in the Juvenile Court on two counts of an attempt to burn a public building, in violation of G. L. c. 266, § 5A (§ 5A or

attempted arson statute), and two counts of malicious destruction of property of $1,200 or less, in violation of G. L. c. 266, § 127, after he performed the viral TikTok "penny challenge" twice at his high school. On November 2, 2021, the juvenile waived his right to a jury trial, and he then proceeded to trial before a judge. Although the judge allowed the juvenile's motion for a required finding of not delinquent on the charges of malicious destruction of property, the judge adjudicated the juvenile delinquent on the two charges of attempting to burn a public building.

The juvenile appeals, arguing that § 5A requires proof of specific intent, and that the evidence presented at trial was insufficient to demonstrate the juvenile acted with the specific intent to burn or set fire to the building. He further argues that, if the court construes attempted arson to be a general intent crime, its application to this case would violate principles of due process and the evidence would remain insufficient. As we determine that § 5A is a specific intent crime, we need not address the latter argument. Having concluded also that the evidence was sufficient to support the juvenile's adjudications of delinquent on both counts of attempted arson, we affirm.[1]

---

[1] We acknowledge the amicus brief submitted by the youth advocacy division of the Committee for Public Counsel Services; Youth Advocacy Foundation; Children's Law Center of

Background.  1.  Facts.  "We recite the facts the [judge] could have found, viewing the evidence in the light most favorable to the Commonwealth . . . ."  Commonwealth v. Witkowski, 487 Mass. 675, 676 (2021).

Around the time of January 2020, a TikTok challenge referred to as the "penny challenge" was gaining popularity among teens.[2]  The challenge, as described by Deputy Fire Chief Leo Foley of the Plymouth fire department (department), who saw video recordings of the challenge being performed, involves the use of a cell phone charger with a charging block,[3] a penny, and a wall outlet.  A performer of the challenge would plug the charger into the wall outlet, leaving it slightly removed from the wall, insert a penny behind the charging block, and push the

_____

Massachusetts; Citizens for Juvenile Justice; Massachusetts Advocates for Children; and Mental Health Legal Advisors Committee.

[2] TikTok "is a short-loop video sharing [application] presently used by over 100 million Americans."  TikTok Inc. v. Trump, 490 F. Supp. 3d 73, 77 (D.D.C. 2020).  TikTok describes itself as "the leading destination for short-form mobile video." TikTok, About TikTok, https://www.tiktok.com/about?lang=en [https://perma.cc/P6N4-D97Q].

[3] A charger is defined as "a device that is used to add electricity to batteries."  Britannica Dictionary, https://www .britannica.com/dictionary/charger [https://perma.cc/8UZL-KKDT]. See TheStreet, Turbo-charge Your Devices With the Best USB-C Charging Blocks (Feb. 27, 2023), https://www.thestreet.com /review/usb-c-charging-block [https://perma.cc/WD7H-LM5D] (USB-C charging block allows one to charge devices "on the go," "leverag[ing] USB-C power delivery technology to charge compatible devices quickly").

charger back in without causing the penny to make contact with the prongs of the charger. As the charger is pulled back out, the penny slides down, hitting the two prongs of the charger, causing a short circuit, and creating an "electrical arc."[4]

The arc created appears visually as sparks and could start a fire. Depending on the level of insulation or whether a circuit is "overloaded," outlets that short circuit frequently will ignite a fire behind the wall. It may cause damage to the circuitry of the electrical system in the building, requiring the outlet to be replaced and the circuit to be tested. Superficial damage to the wall or outlet also may occur, and would look "[l]ike black scorch marks where it [did not] actually catch fire, so to speak, but was damaged by the arcing." After the arc is created, the prongs on the charging block likely are to appear melted to some extent, as a result of

---

[4] Foley defined an electrical arc as "that bright white light that you see like when recently we had all the damage with the power lines . . . , when those are touching each other it creates an electrical arc, like lightning." Britannica defines "electric arc" as

> "[a] continuous, high-density electric current between two separated conductors in a gas or [vapor] with a relatively low potential difference, or voltage, across the conductors. The high-intensity light and heat of arcs are utilized in welding, in carbon-arc lamps and arc furnaces that operate at ordinary air pressure, and in low-pressure sodium-arc and mercury-arc lamps."

Britannica, https://www.britannica.com/science/electric-arc [https://perma.cc/JM69-796W].

the sparks.  It also could create charring on the plastic portion of the charging block.[5]

On January 14, 2020, Joelene McCusker, a history teacher at Plymouth North High School, was helping a group of students in her classroom.  Her classroom was set up to accommodate eight different groups comprised of four desks and two tables in the back of the classroom.  She was facing the front of the room, with her back turned toward the rear wall, when she heard a loud bang coming from the area where the juvenile[6] and another student were working, toward the back of the classroom.  She turned around immediately and saw the juvenile kicking the wall.  When she approached him to ask him what had happened, he told her that his charger got stuck in the wall, and that he was kicking it to get it out.  She noticed that his white cube charger, which he had in his hand, was blackened and charred, and appeared unusable.  She reminded him to behave appropriately for school and instructed him to put away the charger, directing his attention back to the assignment.  She then returned to the students with whom she was working before the incident occurred.

---

[5] At around the same time as the second incident involving the juvenile described infra, Foley received an advisory from the State fire marshal's office warning the department about the challenge and its potential to cause damage or fire.

[6] The juvenile was a special education student.

At that time, she did not think anything of the incident, and she did not look at the outlet.

One week later, on January 21, 2020, Belinda Bechtold, a biology teacher at the same school, and her coteacher, Patrick McWalter, were teaching their biology class based in a science laboratory (lab).  The middle of the classroom was comprised of traditional two-person desks.  Bordering the desks, on each side of the room, three lab benches jutted out from the wall.

Bechtold was teaching at the front of the classroom with the lights out, using an overhead projector.  At one point during her lesson, Bechtold heard a crackling noise and noticed a flash of light coming from the back corner.  McWalter signaled to Bechtold that he would handle the situation.  She continued teaching the class.  McWalter also heard a loud rattling sound coming from the back of the room where the juvenile was sitting.[7] When McWalter approached the students sitting at the back of the room, a student brought his attention to a penny in between the prongs of a cell phone charging block and the outlet nearby. The outlet was about four feet high from the floor, placed above a counter.  The juvenile was sitting in the seat closest to the outlet, about an arm's length away.  He observed that the outlet, which normally was white, had black charring on it, and

---

[7] This area of the classroom contained several outlets, as the lab benches were set up for gas connections and computers.

noticed some charring or blackness on the wall.  There was a penny stuck between the prongs of the charging block.

McWalter, concerned, told the students to stay away from the outlet and walked toward Bechtold to discuss the incident with her.  As he started making his way to the front of the classroom, he heard a loud rattling noise again, causing him to turn around.  He saw sparks coming out of the outlet for a couple of seconds and noticed the juvenile reaching out and grabbing the charging block at the same time.

Once the students were working independently, Bechtold walked to the back of the classroom to check on what had happened when she was instructing the class.  Bechtold noticed that there was "something going on with the wall."  She saw that there was a cell phone charging block in the outlet, and the outlet appeared to be charred in the areas surrounding the block.  Not knowing if the arc still was "live," Bechtold removed the charging block with rubber-plated tongs.  Similar to the outlet, the side of the charging block attached to the prongs was black and charred.  The charging block looked like it had been burned, and the penny was stuck to it.  The penny was misshapen and no longer round, and it was flush with the prongs of the charging block as if it had been pushed down into the prongs.

On that day, members of the department were present at the school for unrelated reasons. McWalter informed the administration what had just happened, and the department members, including Foley, went to observe the damage. In the lab classroom, Foley noticed the outlet had scorch marks indicating a short circuit. Foley then observed the outlet in McCusker's classroom and noted that it had black scorch marks on it.

At some point around that time, McCusker returned to look at the outlet where she had noticed the juvenile kick his charger.[8] She then noted that the outlet was blackened and charred around the bottom and on the side.

2. Procedural history. A complaint issued against the juvenile on January 31, 2020. Due to the COVID-19 pandemic, his arraignment was rescheduled several times. Ultimately, the juvenile was arraigned on August 27. The juvenile filed a motion to dismiss on January 28, 2021. There was a hearing on the motion on February 23, where the juvenile argued that probable cause was lacking to show that he caused the charring in both the January 14 and January 21 incidents and to show intentional burning with malice under the attempted arson

---

[8] McCusker testified that she looked at the outlet about a week after the January 14 incident.

statute.[9]  After the hearing, the judge denied the motion.  In issuing her decision, she stated,

> "[O]n a directed verdict standard I think I'd be hard pressed not to consider [whether the Commonwealth met the standard] very carefully.  I think the biggest issue at that stage would be the maliciousness of the act.  Certainly, it's willful.  I have no doubt that it was willful.  The malice, I think, is a little thinner, a little less clear."

On November 2, 2021, the same judge conducted a colloquy with the juvenile, and he waived the right to a jury trial.  A bench trial was held the same day.  At the close of evidence, the juvenile moved for a required finding of not delinquent on all of the charges against him.  The juvenile asserted that there was insufficient evidence to demonstrate beyond a reasonable doubt that he engaged in acts that caused the blackening of the outlets and that, even if the judge found that the evidence was sufficient on that point, the evidence was insufficient to demonstrate that he attempted to burn the building and that he acted willfully and maliciously.  The judge granted the juvenile's motion with respect to the counts alleging malicious destruction of property.  As to the attempted arson charges, the judge denied the motion, indicating that "[a] burning is malicious if it is done with a wrong and unlawful motive or purpose."

---

[9] The juvenile also argued that there was no probable cause for the counts of malicious destruction of property.

After closing arguments, the judge adjudicated the juvenile delinquent on both charges of attempting to burn a public building.[10]  As to her finding on malice under § 5A, the judge stated that the Commonwealth proved that the acts were intentional and by design, showing that they were the "willful doing of a harmful act without excuse."  The juvenile filed a timely notice of appeal, and we allowed the juvenile's application for direct appellate review.

Discussion.  1.  Intent required by § 5A.  Both parties assert that to violate § 5A one must have a specific intent eventually to burn or set fire to a qualifying building, structure, or property.  We review questions of statutory interpretation de novo.  Commonwealth v. Fleury, 489 Mass. 421, 424 (2022).  If the language of the statute "is clear and unambiguous, we 'must give effect to its plain and ordinary meaning and . . . need not look beyond the words.'"  Id., quoting Shaw's Supermkts., Inc. v. Melendez, 488 Mass. 338, 341 (2021).  "The 'venerable distinction at common law between general and specific intent has been the source of a good deal of confusion' (citations and quotations omitted)."  Commonwealth v. Pfeiffer, 482 Mass. 110, 115, cert. denied, 140 S. Ct. 498 (2019), quoting Commonwealth v. Gunter, 427 Mass. 259, 268

---

[10] The judge indicated that the January 14 incident was a closer case than the January 21 incident.

(1998), S.C., 456 Mass. 1017 (2010) and 459 Mass. 480, cert. denied, 565 U.S. 868 (2011). "[I]n a general sense, 'purpose' corresponds loosely with the common-law concept of specific intent, while 'knowledge' corresponds loosely with the concept of general intent." Gunter, supra, quoting United States v. Bailey, 444 U.S. 394, 405 (1980). Specific intent requires not only that the juvenile "consciously intended to take certain actions, but that [he] also consciously intended certain consequences." Pfeiffer, supra, quoting Gunter, supra at 269. We agree with both parties that the intent required under G. L. c. 266, § 5A, is specific intent, as evidenced by both the plain language of the statute and existing case law.

"An attempt to commit a crime necessarily involves an intent to commit that crime." Commonwealth v. Hebert, 373 Mass. 535, 537 (1977). See 2 W.R. LaFave, Substantive Criminal Law § 11.3, at 293 (3d ed. 2018) ("The crime of attempt consists of [1] an intent to do an act or to bring about a certain consequence which would in law amount to a crime; and [2] an act in furtherance of that intent"). The crime of general attempt, G. L. c. 274, § 6 (general attempt statute), is comprised of two elements: "(1) the specific intent to commit the substantive crime at issue, and (2) an overt act toward completion of the substantive crime." Commonwealth v. LaBrie, 473 Mass. 754, 764 (2016) (elements of general attempt and attempted murder are

same).  The substantive crime is important because the crime of attempt is geared toward punishing acts bearing "a proximate relation to that crime."  Id. at 763.  In Commonwealth v. Peaslee, 177 Mass. 267 (1901), the court considered an attempt to burn a building under an earlier version of the general attempt statute.  Under Peaslee, whether an overt act "coupled with an intent to commit the crime" meets the definition of an attempt depended on the degree of proximity to the completion of the crime.  Id. at 272.

Section 5A was added to G. L. c. 266 by St. 1932, c. 192, § 5.  This section indicates:

"Whoever wilfully and maliciously attempts to set fire to, or attempts to burn, or aids, counsels or assists in such an attempt to set fire to or burn, any of the buildings . . . mentioned in the foregoing sections, or whoever commits any act preliminary thereto or in furtherance thereof, shall be punished by imprisonment in the [S]tate prison for not more than ten years, or by imprisonment in a jail or house of correction for not more than two and one half years or by a fine of not more than one thousand dollars.

"The placing or distributing of any flammable, explosive or combustible material or substance or any device in or against any building . . . mentioned in the foregoing sections in an arrangement or preparation with intent eventually to wilfully and maliciously set fire to or burn such building . . . or to procure the setting fire to or burning of the same shall, for the purposes of this section, constitute an attempt to burn such building . . . ."

G. L. c. 266, § 5A.[11]  "The second part of § 5A . . . contains a definition of 'attempt' in respect to arson and the related offences there described."  Commonwealth v. Mehales, 284 Mass. 412, 416 (1933).  The enactment of the attempted arson statute "changed the preexisting law."  Id.  "The purpose of its plain words is to declare a comprehensive definition of 'attempt . . . .'"  Id.  The definition of attempt in the second paragraph of the statute superseded the "narrower conception" articulated in Peaslee.[12]  Mehales, supra.  See Commonwealth v. Jaffas, 284 Mass. 417, 421 (1933) ("It is apparent from a reading of [St. 1932, c. 192], in its entirety that the design of the General Court in enacting it was to broaden the scope of the legislative enactments touching 'arson and certain related offences.'  Some penalties are made less, but the description of the offenses is somewhat less technical and more comprehensive than in preexisting statutes").

---

[11] The attempted arson statute was amended by St. 1977, c. 975, inserting "by imprisonment in the [S]tate prison for not more than ten years, or."  See Commonwealth v. Banner, 13 Mass. App. Ct. 1065, 1067 (1982) (prior to 1977 amendment, penalty prescribed was limited to incarceration in jail or house of correction, which "[t]he Legislature apparently determined . . . was an inadequate punishment").

[12] In Peaslee, the court stated that "an overt act although coupled with an intent to commit the crime commonly is not punishable if further acts are contemplated as needful."  Peaslee, 177 Mass. at 272.  Peaslee required a preparation coming "very near to the accomplishment of the act."  Id.

By the plain language of the statute, the intent required is specific.  Particularly, to meet the element of attempt, the Commonwealth must show that the juvenile "plac[ed] or distribut[ed] . . . any flammable, explosive or combustible material or substance or any device in or against any building . . . mentioned in the foregoing sections in an arrangement or preparation with intent eventually to wilfully and maliciously set fire to or burn such building" (emphasis added).  G. L. c. 266, § 5A.  The mens rea requirement of a violation of § 5A can be broken up into two elements:  (1) the specific intent to burn or set fire to a qualifying building; and (2) acting willfully and maliciously.  We examine each of these showings in turn.

Because attempt to burn a public building, contrary to the substantive crime of arson, is a specific intent crime, a showing that "a reasonable person in the [juvenile]'s position would have known that there was a plain and strong likelihood that some portion of a dwelling house would be set on fire or burned" is not enough.  Pfeiffer, 482 Mass. at 121.  An intent eventually to set fire to or burn a building is required for a conviction.  G. L. c. 266, § 5A.  "Although specific intent requires proof that the [juvenile] intended [his] conduct and its consequences, it does not require proof that the consequences [he] intended were as extensive as those realized

. . . only that the consequences [he] intended are among those covered by the statute." Pfeiffer, supra at 122. An intent to "burn" or "char[]" some portion of the building is sufficient; the juvenile need not have intended that the building be destroyed or consumed by fire. Id. at 122, 143 (Appendix). See A.F. Curtis, Treatise on the Law of Arson Covering the Decisions of All American States and Territories, and Including Those of England and the British Colonies § 63, at 80 (1936) (Curtis, Treatise on the Law of Arson) ("In the absence of words indicating a contrary intention, a statute will not be construed as requiring an intent to destroy, but merely an intent to burn"); 3 LaFave, Substantive Criminal Law § 21.3(b), at 319-320 (addition of "sets fire" to "burns" in arson statute sometimes is construed to "extend[] arson liability to those rare cases in which the fire does damage to the building without any 'burning' of the building itself"; "[s]uch broadening of the law of arson, it has been contended, is the 'better view' and 'clearly the modern trend of authority today'" [citations omitted]).

The term "willfully" means "intentional and by design in contrast to that which is thoughtless or accidental." Pfeiffer, 482 Mass. at 116, quoting Commonwealth v. McGovern, 397 Mass. 863, 868 (1986). For the substantive crime of arson and, thus, the crime of attempt to burn a public building, malice "comprises only three components": "[t]he wilful doing of an

unlawful act without excuse." Commonwealth v. Dung Van Tran, 463 Mass. 8, 26 (2012), quoting Commonwealth v. McLaughlin, 431 Mass. 506, 513 n.6 (2000).  Malice, for the purposes of the crime of arson, "need not be express, but may be implied; it need not take the form of malevolence or ill will, but it is sufficient if one deliberately and without justification or excuse sets out to burn [a public building as defined by statute]."  Commonwealth v. Lamothe, 343 Mass. 417, 419 (1961), quoting State v. Pisano, 107 Conn. 630, 632 (1928).  This malice requirement is just as applicable to the crime of attempted arson under § 5A, as that offense "is so closely related to arson that it is very unlikely that the Legislature intended the word to be used in a different sense."  Lamothe, supra at 420. See Mehales, 284 Mass. at 415 (malice for purposes of § 5A is "all acts done with an evil disposition, a wrong and unlawful motive or purpose; the wilful doing of an injurious act without lawful excuse" [citation omitted]).

Having defined the mens rea requirements for the crime of attempting to burn a public building under § 5A, we move on to consider whether the evidence presented against the juvenile was sufficient to support his convictions.[13]

---

[13] As we hold that G. L. c. 266, § 5A, requires a showing of specific intent, we need not address the juvenile's arguments that the statute's application would violate constitutional principles of due process were it a general intent crime.  See Commonwealth v. Manolo M., 486 Mass. 678, 692 (2021), quoting

2.  Sufficiency of the evidence.  The juvenile argues that the evidence was insufficient to prove that he intended to burn or set fire to the building.  Relying on the judge's ruling that the evidence was insufficient to prove malicious destruction of property, he asserts that she "conveyed her belief that [he] did not specifically intend to burn or set fire to the building." He argues that the evidence supporting his attempt to perform the challenge was insufficient to support an intent to set fire to or burn the building.  The Commonwealth argues that the evidence was sufficient to support the two charges of attempt to burn a public building and asserts that the juvenile did not raise the issue of specific intent before the judge at trial.[14]

---

Commonwealth v. Raposo, 453 Mass. 739, 743 (2009) (generally we do "not . . . decide constitutional questions 'unless they must necessarily be reached'").

[14] The juvenile raised the issue of intent explicitly at the motion to dismiss hearing; at trial, in his argument for a directed verdict, he focused on the lack of a showing of malice, but mentioned that there was insufficient evidence that he "attempted to burn the building."  Regardless of whether the juvenile effectively raised this challenge below, we consider his sufficiency argument, as "findings based on legally insufficient evidence are inherently serious enough to create a substantial risk of a miscarriage of justice."  Commonwealth v. Grandison, 433 Mass. 135, 140 n.8 (2001), quoting McGovern, 397 Mass. at 867.

We address whether the Commonwealth sufficiently proved specific intent.  Therefore, we need not address the juvenile's argument that there was insufficient evidence under a general intent requirement.

"In assessing the sufficiency of the evidence, we consider 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Commonwealth v. Davis, 487 Mass. 448, 462 (2021) (Davis I), quoting Commonwealth v. Latimore, 378 Mass. 671, 677 (1979). "Circumstantial evidence is sufficient to find someone [delinquent] beyond a reasonable doubt and inferences drawn from such circumstantial evidence 'need only be reasonable and possible; [they] need not be necessary or inescapable.'" Davis v. Commonwealth, 491 Mass. 1011, 1013 (2023), quoting Davis I, supra. Nonetheless, a conviction may not "be based on conjecture or on inference piled upon inference." Commonwealth v. Jones, 477 Mass. 307, 316 (2017).

We first assess the January 14 incident.[15] We conclude that the Commonwealth presented evidence sufficient to demonstrate beyond a reasonable doubt that the juvenile intended to burn the building through his performance of the challenge. The Commonwealth introduced testimony surrounding a "viral teen video resulting in fire incidents," and Foley described this video as utilizing a charging block, a penny, and a wall outlet to create a short circuit and produce an electrical arc, or a

---

[15] As the juvenile does not contest any of the other elements of an attempt to burn a public building, we focus our analysis on the juvenile's specific intent.

bright white light resembling sparks that may start a fire. After creating the sparks, the prongs on the charger likely are to appear melted and the sparks may create charring on the plastic portion of the charging block and black scorch marks indicating damage on the wall or outlet. Bechtold described the challenge as "[k]id[s] . . . putting pennies into . . . chargers and using them to create sparks by plugging them into outlets."

As McCusker was teaching her students, she heard a loud bang coming from the area where the juvenile was sitting, and she saw the juvenile kicking the wall. She noticed that the juvenile's white cube charging block, which he had in his hand, was blackened and charred, and appeared unusable. About a week later, when McCusker went back to look at the outlet, she noted it was blackened and charred around the bottom and on the side.

The juvenile's specific intent to burn the building can be inferred from the consequences of successfully performing the challenge and the facts demonstrating his attempt to perform the challenge that day. The juvenile's charging block -- a white cube -- matched the description of those typically used in performing the challenge, a "white block charger." The juvenile kicked his charger out of the outlet, leading to a reasonable inference that he knew it would be dangerous to touch, and thus knew the consequences of performing the challenge. When McCusker noticed the charger in the juvenile's hand, it was

blackened and charred, and appeared unusable.  When she looked at the outlet a week later, she noticed that it was blackened and charred.  This is consistent with the consequences of the performance of the challenge.  The juvenile did not ask for help, despite the fact that a "loud bang" was emitted and his charging block appeared damaged.  See, e.g., Pfeiffer, 482 Mass. at 123 (intent inferable where defendant left and locked door without attempting to extinguish fire she set or call for help); Dung Van Tran, 463 Mass. at 27-28 (defendant's failure to put out fire or sound alarm supported inference that defendant intended to burn apartment); Commonwealth v. Cavedon, 301 Mass. 307, 314-315 (1938) (failure to give alarm contributed to guilty finding on arson charge).  "An inference drawn from circumstantial evidence need only be reasonable and possible; it need not be necessary or inescapable" (quotation omitted).  Dung Van Tran, supra at 27, quoting Commonwealth v. Merola, 405 Mass. 529, 533 (1989).  "We are mindful that in arson cases the Commonwealth often can prove guilt only by a web of circumstantial evidence that entwines the suspect in guilt beyond a reasonable doubt."  Pfeiffer, supra, quoting Choy v. Commonwealth, 456 Mass. 146, 150, cert. denied, 562 U.S. 986 (2010).  A reasonable juror fairly could draw the inference that the juvenile was aware of and intent on performing the challenge to set off sparks on January 14 from the description of the

challenge and its consequences provided by Foley, and from the juvenile's actions, including both his failure to ask for help and his kicking of the charger.

The intent to create sparks, which is the "bright white light" indicated in the challenge, is sufficient to demonstrate an intent to burn. The substantive crime of arson requires proof only that some portion of the property was on fire or burned. Pfeiffer, 482 Mass. at 122. Specific intent requires that the juvenile intended his conduct and its consequences, and that the intended consequences met the requirements of the statute. Id. It does not require proof that his intended consequences were as severe as the extant consequences of his actions. Id. His intent to perform the challenge, the purpose of which is to create sparks within the building, equates to an intent to "burn" the property, meeting the requirements of § 5A. See id. (charring sufficient for arson). "Burn" is defined as

> "to consume fuel and give off light, heat, and gases . . .
> to give off light . . . to become altered by the action of
> fire or heat . . . to become charred, scorched, seared, or
> consumed by excessive heat . . . to injure by fire or heat:
> alter a property of by undue exposure to fire or heat."

Webster's Third New International Dictionary 299 (2002). Performing a challenge designed to create sparks, or a "bright white light," within a building would fall within the definition of "burn." For this reason, the juvenile's kicking of the charger out of the outlet does not abate his intent to burn,

i.e., his intent to cause the sparks and create the heat resulting in charring.[16]  See Curtis, Treatise on the Law of Arson § 120, at 141 ("intent to burn may be inferred from the act itself, if the . . . particular purpose could not have been effected without such burning, for every person is held responsible for the necessary and natural consequences of his acts and is held to intend to produce such consequences"); 3 LaFave, Substantive Criminal Law § 21.3(b), at 320 (broad view of arson law "modern trend of authority today" [citation omitted]).

The facts presented regarding the January 21 incident provided ample support for the charge of attempted arson.  After he attempted the challenge on January 14, the juvenile was aware that performing it would result in charring in addition to the sparks.  Despite this awareness, only one week later, the juvenile attempted the challenge again -- not once, but twice.  During another one of his classes, teachers saw a flash of light and heard a loud "rattling" or "crackling" noise coming from the area where the juvenile was sitting.  McWalter was informed that there was a penny in between the prongs of a charging block and an outlet in the classroom.  The juvenile was sitting within an arm's length distance from the outlet.  McWalter observed

---

[16] The juvenile's kicking of the charger also permits an inference that he was aware that performing the challenge would produce excessive heat.

charring on the outlet and the wall. He also noted a penny stuck between the prongs of the charging block. After McWalter told the students to stay away from the outlet and turned around to update Bechtold, he heard the same noise, saw sparks coming out of the outlet for several seconds, and noticed the juvenile simultaneously reaching out and grabbing the charging block. The charging block looked like it was burned, and the outlet and sides of the charging block were black and charred, indicating a short circuit. The penny was misshapen and flush with the prongs of the charging block.

In addition to the testimony discussed supra regarding the popularity of and procedure for completing the penny challenge, after the January 14 incident, the juvenile was well aware that performing this challenge would create sparks and result in the charring and damaging of his charger. In the light most favorable to the Commonwealth, he also would have been aware that it resulted in the charring and blackening of the wall outlet. Even putting aside his performance of the challenge on January 14, after the first attempt on January 21 resulting in the penny's adherence to the prongs of the charging block, he knew that engaging in this behavior would create sparks and charring on the outlet and the wall. In spite of that, he ignored McWalter's command to stay away from the outlet and

touched the charging block again, creating sparks.[17]  These

actions are sufficient to demonstrate an intent to burn the

building.  See, e.g., Pfeiffer, 482 Mass. at 122; Commonwealth

v. Beneche, 458 Mass. 61, 80 (2010) (prior bad acts admissible

to show intent).

The juvenile asserts that "the judge found the evidence

insufficient to support a finding that [the juvenile] intended

to burn or set fire to the building."  He bases this argument on

the judge's statements in allowing the juvenile's motion for a

required finding of not delinquent on the malicious destruction

of property charges.  The judge stated that because the juvenile

was charged with malicious, and not wanton, destruction of

property, the malice requirement necessitated a showing not only

that he "act[ed] deliberately," but also that he acted out of

"cruelty, hostility[,] or revenge."  The judge indicated that

the juvenile performed the acts "out of means to be a prankster,

a very dangerous prank, no doubt, but clearly wanton

destruction."  Despite her finding as to the absence of malice

for the purposes of malicious destruction of property, the judge

found that the Commonwealth met its burden on the malice

requirement under § 5A, which she noted "[did] not require any

---

[17] We note that although McWalter testified that the juvenile "grabb[ed] the charging block," it reasonably may be inferred that he did not remove the block, as Bechtold ultimately removed it from the outlet herself.

particular ill will against someone" but just that "it [was] done with a wrong and unlawful motive or purpose."[18]

The judge was correct that the malice requirements are different, and she stated a proper understanding of the malice requirements of each statute.[19] Because the malice requirement of malicious destruction of property requires a showing of animus, the judge's references to "wanton" in regard to the malicious destruction counts does not implicate her thought process with respect to the specific intent requirement in § 5A. As mentioned previously, the malice requirement for arson and, thus, for attempted arson, is "[t]he wilful doing of an unlawful act without excuse" (citation omitted). Dung Van Tran, 463 Mass. at 26. See Lamothe, 343 Mass. at 419-420 (meaning of malice for arson is applicable to attempted arson). "Although both 'malicious' and 'wilful' require that a person act

---

[18] In finding the juvenile delinquent on attempted arson after closing arguments, the judge stated,

> "I feel that the Commonwealth has proved that it was a willful act, meaning intentionally and by design, not accidental or negligent; and that it was done maliciously, which does not require any particular ill will against someone. A burning is malicious if it's done with a wrong and unlawful motive or purpose, if it is the willful doing of a harmful act without excuse."

[19] For malicious destruction of property, the Commonwealth must show "that the [juvenile]'s conduct was 'motivated by "cruelty, hostility or revenge."'" Commonwealth v. Armand, 411 Mass. 167, 170 (1991), quoting Commonwealth v. Schuchardt, 408 Mass. 347, 352 (1990).

intentionally, the definitions shed no light on whether the statute requires specific or general intent." Pfeiffer, 482 Mass. at 116-117.  Attempt to burn a public building under § 5A requires a finding of specific intent, in addition to a finding of malice.  The fact that the judge found the juvenile to have been acting as a "prankster" does not eliminate the possibility that he acted with the specific intent to burn the building; as discussed supra, that intent may have been formed by the desire to perform a "prank," the purpose of which was to set off sparks inside a public building.  We presume that the judge was aware of this, and that she correctly instructed herself on the law. Commonwealth v. Healy, 452 Mass. 510, 514 (2008).

We recognize the "naiveté" and "immaturity" that children often display.  Commonwealth v. Evelyn, 485 Mass. 691, 699 (2020).  Nonetheless, in the light most favorable to the Commonwealth, the evidence demonstrated that the juvenile specifically intended his conduct and its consequences:  to perform the challenge and emit sparks from the outlet.  This is prohibited by the language of § 5A.  Accordingly, we must affirm his delinquency adjudications.

Judgment affirmed.